Exhibit "2"

Exhibit 2
70

AGREEMENT made this _5th_ day of *April*, 1997, between Romye Robinson, E. Imani Wilcox and Trevant Hardson, jointly and severally [professionally known as "Pharcyde"], ([individually and collectively] referred to herein as "you") and Delicious Vinyl, Inc., a California corporation (hereinafter "Company").

PREAMBLE

A.    You and Company acknowledge that you and Derrick Stewart ("Stewart"), on the one hand, and Company, on the other hand, are parties to an exclusive recording agreement dated May ___, 1992, as the same may have been amended (the "Prior Agreement");

B.    You and Company have entered into a memorandum dated January 13, 1997 (the "Memorandum"), which terminated the term of and otherwise amended the Prior Agreement and pursuant to which you entered into a new exclusive recording agreement between you and Company (the "New Agreement");

C.    Your royalty account under the New Agreement will _not_ be cross-collateralized with your royalty account under the Prior Agreement;

D.    You and Company now wish to enter into a more formal agreement documenting the amendment to the Prior Agreement (the "Amendment"), and this agreement, more fully documenting the terms of the New Agreement; and

E.    Although Stewart will not execute and will not be a party to this agreement, as a condition precedent of this agreement, you agree to cause Stewart to enter into and execute the Amendment not later than seven (7) business days after your full execution thereof.

1.    TERM

1.01.    (a)    The term of this agreement will begin on the date first written above.

(b)    The initial Contract Period of the term will end nine (9) months after the earlier of the dates referred to in sections (1) and (2) below:

(1)    the date of completion of the lacquer, copper, or equivalent masters to be used in manufacturing the disc Phonograph Records units to be made for distribution in the United States from the last Master Recordings made in fulfillment of your Recording Commitment for that Contract Period under paragraph 3.01 below; or

Exhibit 2
71

(2)    the date thirty (30) days after you give Company notice that you have completed the Delivery of those Master Recordings, but will not end earlier than one (1) year after the date of its commencement.

1.02. You grant Company two (2) separate, consecutive and irrevocable options to extend that term for additional Contract Periods ("Option Periods") on the same terms and conditions applicable to the initial Contract Period, except as otherwise expressly provided in this agreement. Each of those options shall be exercised by Company, if at all, by notice to you not later than the expiration date of the Contract Period which is then in effect (the "current Contract Period"). Each Option Period for which Company exercises its option will begin immediately after the end of the then-current Contract Period and will end nine (9) months after the earlier of the dates referred to in sections 1.01(b)(1) and (2) above.

## 2.    SERVICES

2.01. During the term of this agreement you will render services as a performing artist for the purpose of making Master Recordings for Company; you will cause those Recordings to be produced and you will Deliver the Recordings to Company, as provided in this agreement.

2.02. (a)    Your obligations will include furnishing the services of the producers of those Master Recordings and you will be solely responsible for engaging and paying them. (Producers of Master Recordings hereunder are referred to herein as "Producers".)

(b)    If Company, instead, engages Producers for any of those Master Recordings, or if the Producers of any such Recordings are regularly employed on Company's staff or render their services under contract with Company, your royalty account and the production budget for the recording project concerned will be charged with a Recording Cost item in the amount of the fee concerned and/or advance payable to such Producer(s) pursuant to their agreement with Company and your royalty on Phonograph Records made from those Recordings under Articles 9 and 10 will be reduced by the amount of the royalty payable to such Producer(s) pursuant to their agreement with Company. This subparagraph (b) will not apply unless you have consented to the engagement of the Producer concerned, or the assignment of the staff or contract Producer concerned, to the recording project. Notwithstanding anything to the contrary contained in this paragraph, Company and you shall mutually designate the individual producer of six (6) Master Recordings per Album and the selections to be embodied in those Master Recordings.

145416AG:NO3                                  2

Exhibit 2
72

3.    **RECORDING COMMITMENT**

3.01.  During each Contract Period, you will perform for the recording of Master Recordings sufficient to constitute one (1) Album, cause those Master Recordings to be produced and Deliver them to Company (the "Recording Commitment").  Each Album required to be recorded and Delivered by you hereunder is herein sometimes referred to as a "Commitment Album".

3.02.  You will fulfill the Recording Commitment for each Contract Period within the first five (5) months of the Contract Period.

3.03.  Each Commitment Album (or other group of Master Recordings) Delivered to Company will consist entirely of Master Recordings made in the course of the same Album (or other) recording project, unless Company consents otherwise.  Company may withhold that consent in its unrestricted discretion.

4.    **RECORDING PROCEDURE**

4.01.  You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)    Except as expressly noted otherwise in this agreement, prior to the commencement of recording in each instance, you and Company shall mutually approve (which approval shall not be unreasonably withheld or delayed by either party) each of the following, in order, before proceeding further:

(1)    Selection of Producer.

(2)    Selection of material, including the number of Compositions to be recorded.  You will advise Company of the content of each medley before it is recorded.  Unless you are solely an instrumentalist, no Master Recording made hereunder shall embody solely an instrumental Performance.  Company shall not be deemed to be unreasonable in rejecting any material which in Company's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Company to liability or unfavorable regulatory action.  You shall not record a Multiple Record Set without Company's consent, which may be withheld for any reason.

(3)    Selection of dates of recording and studios where recording is to take place, including the cost of recording at such studios.  You shall not begin recording any Commitment Album within five (5) months after the Delivery of the prior Commitment Album.  Company shall not be deemed to be unreasonable in rejecting a studio if it is not a first-class recording studio, if its use would be

145418A6.N03

3

Exhibit 2
73

inconsistent with any of Company's union agreements, if Company anticipates that its use would cause labor or other difficulties, or if Company anticipates that its use would require expenditures inconsistent with the approved recording budget. The scheduling and booking of all studio time will be done by Company.

(4)    A proposed budget (which you will submit to Company sufficiently in advance of the planned commencement of recording to give Company a reasonable time to review and approve or disapprove it, at least fourteen (14) days before the planned commencement of recording). A recording budget (inclusive of Producer advances and/or fees) for any Commitment Album which does not exceed seventy percent (70%) of the amount of the applicable minimum Recording Fund prescribed in paragraph 6.02 will not be disapproved by reason of its overall amount.

(b)    You shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)    In connection with the requirements of the U.S. Immigration Law, you shall not engage or permit the engagement of any Person to perform services with respect to any Master Recording unless and until you have caused such Person to properly complete an INS Form I-9, you have executed, completed and signed the employer verification section thereof, you have attached copies of documents verifying employment eligibility, and you have delivered same to Company with respect to each such Person within seventy-two (72) hours after the applicable Person first renders services with respect to Master Recordings hereunder. You will comply with any revised or alternative employment verification procedure of which Company advises you in the future.

(d)    As and when required by Company, you shall allow Company's representatives to attend any or all recording sessions hereunder at Company's expense. (Those expenses will not be recoupable as Recording Costs.)

(e)    You shall timely supply Company with all of the information it needs in order: (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations Company may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings. Without limiting the generality of section (2) of the preceding sentence:

(1)    You shall furnish Company with all information it requires to comply with its obligations under its union agreements, including, without limitation, the following:

145418AG.NO3                                    4

Exhibit 2
74

(i)      If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions;

(ii)     Each change of title of any Composition listed in an AFM Phonograph Recording Contract (Form "B"); and

(iii)    A listing of all the musical selections contained in Recordings Delivered to Company hereunder; and

(2)      You will deliver to Company all AFM or AFTRA session reports, tax withholding forms, and other documentation required by Company within seventy-two (72) hours after each recording session hereunder so that Company may timely make all required union payments to the session musicians and other employees concerned, if any.

(f)      You shall deliver to Company fully mixed, edited, and unequalized and equalized Master Recordings (including but not limited to a final two-track equalized tape copy), which are technically and commercially satisfactory to Company for the production, manufacture and sale of Phonograph Records, all original and duplicate Master Recordings of the material recorded, together with all necessary licenses and permissions, including, without limitation, those relating to all samples, if any, interpolated in the Master Recordings, and all materials reasonably required to be furnished by you to Company for use in the packaging and marketing of the Records, including, without limitation, complete and accurate label copy and liner note information. Each Master Recording will be clearly marked to identify you as the recording artist, and to show the title(s) of the Composition(s) and recording date(s).

(g)      You shall comply with Company's policies with respect to samples, and you hereby warrant and represent that all information supplied by you to Company in that regard is and shall be complete and correct. As of the date hereof, Company's policies with respect to all samples embodied in any Master Recording (including remixes of Master Recordings, regardless of whether such remixes will be commercially released) are as follows:

(1)      Prior to Company's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder, you shall deliver the following to Company for the applicable set of Master Recordings:

(i)      A detailed list of any and all samples embodied in each Master Recording;

Exhibit 2
75

(ii)     A written clearance or license for the perpetual, non-restrictive use of each such sample interpolated in each Master Recording in any and all media from the copyright holder(s) of the Master Recording and the Composition sampled.

(iii)     Any and all necessary information pertaining to credit copy required by the copyright holder(s) of each sample interpolated in each Master Recording.

(2)     No Master Recording will be scheduled for release and no Master Recording shall be deemed to be Delivered to Company hereunder (and no Advances due on Delivery, if any, will be paid) until such written sample clearances (including credit copy, if any) have been obtained and approved by Company.

(3)     If any such sample clearance provides for an advance, a flat-fee "roll-over" payment and/or a royalty payment for Net Sales of the applicable Master Recording and your record royalty account hereunder is in an unrecouped position at the time such royalties are due, then, notwithstanding anything to the contrary contained herein, you shall be solely responsible for making, and shall make, such payment(s) to the applicable Person promptly upon receipt from Company of such Person's accounting statement thereof. If Company makes any such payment(s), such payment(s) will constitute an Advance and will be recoupable from all monies becoming payable by Company to you under this agreement.

4.02.  No Composition previously recorded by you will be recorded under this agreement. No "live" Recording, solely instrumental Recording (unless you are solely an instrumentalist), Joint Recording, or Recording not made in full compliance with this agreement will apply in fulfillment of your Recording Commitment, nor will Company be required to make any payments in connection with any such Recording except any royalties which may become due under this agreement if the Recording is released by Company.  No Recordings shall be made by unauthorized dubbing or sampling.

4.03.  Nothing in this agreement shall obligate Company to continue or permit the continuation of any recording session or project, even if previously approved hereunder. If Company reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be technically and commercially satisfactory to Company for the production, manufacture and sale of Phonograph Records.

4.04.  You will not be required to perform together with any other royalty artist without your consent, which may be withheld for any reason.

145418AG.N03

6

Exhibit 2
76

## 5.    RECOUPABLE AND REIMBURSABLE COSTS

5.01. Company will pay all union scale payments required to be made to you in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by Company for the recording of such Master Recordings, and all other amounts required to be paid by Company pursuant to any applicable law or any collective bargaining agreement between Company and any union representing Persons who render services in connection with such Master Recordings. If Company incurs any penalties for late payments caused by your delay in submitting union contract forms, invoices or other similar forms, you will promptly reimburse Company for same upon demand, and without limiting Company's other rights and remedies, Company may deduct an amount equal to all such penalties from all monies otherwise becoming payable by Company to you under this agreement. Notwithstanding the foregoing, you agree that the Advances hereunder include the prepayment of session union scale to you as provided in the applicable union codes, and you agree to complete any documentation required by the applicable union to implement this sentence. (Union contracts will be filed and supplied to Company and pension benefits will be paid on your behalf by Company which payments shall be an Advance.)

5.02. (a)    All Recording Costs will constitute Advances. Any Recording Costs in excess of the applicable Recording Fund fixed in paragraph 6.02 or other amount approved in writing by Company, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by Company). Those amounts will also be recoupable from all monies becoming payable by Company to you under this agreement or "any other agreement" (as such phrase is defined in subparagraph 14.11, subject to paragraph 5.02 (d) herein) to the extent to which they have not actually been paid or reimbursed as provided in the preceding sentence. Fifty percent (50%) of all costs incurred by Company in connection with the production or acquisition of rights in Covered Videos (sometimes referred to herein as "Video Costs") and fifty percent (50%) of all direct expenses paid or incurred by Company in connection with independent promotion, marketing or publicity with respect to Recordings of your Performances (i.e., promotion, marketing or publicity by Persons other than regular employees of Company), will constitute Advances (provided, that one hundred percent [100%] of all Video Costs will be recoupable from any and all royalties in respect of the commercial exploitation of Covered Videos hereunder); provided further, that Company will not incur any recoupable independent publicity costs hereunder without your prior approval thereof; provided further, that Company will consult with you concerning third parties engaged by Company for independent promotion of Recordings hereunder. You and Company mutually agree to a marketing fund of Three Hundred Thousand Dollars ($300,000) for the First Album (Marketing Fund"). The Marketing Fund shall include, without limitation, promotion, marketing, publicity, tour support, "co-op" advertising and artwork, but specifically excluding Video Costs up to the amount of the approved Production

145418AG.N03

7

To Be Spent by Company

Exhibit 2
77

Budget, as defined herein, subject to the provisions of paragraph 8.04(f) below. For the avoidance of doubt, any Video Costs in excess of the approved Production Budget shall apply in reduction of the Marketing Fund.

(b)     The amounts applicable to any Joint Recording which are payable by you or chargeable against your royalties under this paragraph 5.02 will be computed by apportionment as provided in paragraph 10.01.

(c)     Payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon Record sales (so-called "per-record royalties"), will not be recoupable from your royalties or reimbursable by you. With respect to the preparation of a lacquer, copper, or equivalent master from a fully mixed, edited, and equalized master tape, an amount equal to the normal engineering charges which would reasonably be incurred in connection with the production of such a master on a real time basis at Company's studios (or other studios designated by Company) will be excluded in the calculation of Recording Costs, but all costs in excess of those normal engineering charges will be included in that calculation.

(d)     Your royalty account under this agreement will not be cross-collateralized with your royalty account under the Prior Agreement, and, accordingly, no advances or other recoupable costs incurred under the Prior Agreement will be charged against your royalty account under this agreement; provided that all advances and other recoupable charges incurred under the Prior Agreement will be recoupable from any and all royalties earned by you and/or Stewart under the Prior Agreement.

(e)     You hereby acknowledge and agree that you have received from Company a total of Four Hundred and Sixty Five Thousand Dollars ($465,000) with respect to the First Album and you and Company hereby further acknowledge and agree that one-half of such amount (Two Hundred and Thirty Two Thousand Five Hundred Dollars ($232,500)) shall be deemed non-recoupable and shall not be charged to your royalty account under this agreement.

6.     **ADDITIONAL ADVANCES; MINIMUM ANNUAL COMPENSATION**

6.01.  All monies paid by Company to or on behalf of you during the term of this agreement (including, without limitation, all monies payable pursuant to paragraph 1.03 above) except royalties paid pursuant to Articles 9, 10 and 12, will constitute Advances.

6.02.     (a)     In connection with each Commitment Album, except the First Album, Company will pay you an Advance in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs (including anticipated costs not yet paid or billed) for such Commitment Album:

145419AG.N03                                    8

Exhibit 2
78

(1)     The amount of the approved Recording Costs for the Commitment Album Delivered during the initial Contract Period ("First Album") will be Three Hundred and Twenty Five Thousand Dollars ($325,000). No Recording Costs shall be incurred by you until such time as you and Company mutually approve a budget submitted by you to Company. Upon such approval, Delicious Vinyl shall open a separate bank account, into which Company shall deposit Thirty Thousand Dollars ($30,000) per month for the payment of the approved Recording Costs for the First Album (the "Account"). If at any time the Account is depleted, Company shall promptly replenish the Account, using reasonable efforts to do so within two (2) business days, however no failure to do so shall be a breach of this agreement. The balance of the Recording Fund for the First Album, if any, will be paid to you as an Advance within thirty (30) days after the Delivery to Company of the First Album.

(2)     Within thirty (30) days after delivery of the First Album, Company will pay you an Advance in the amount of Fifty Thousand Dollars ($50,000), less the amount (if any) by which the actual Recording Costs for the First Album exceed the approved Recording Costs therefor.

(3)     Promptly following full execution of this agreement, Company will pay you an additional Advance in the amount of One Hundred and Fifty Thousand Dollars ($150,000).

(4)     The amount of the Recording Fund for each Commitment Album (other than the First Album) Delivered hereunder will be two-thirds (2/3) of the net amount of the royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of the Commitment Album released most recently before the Delivery of the Commitment Album concerned (the "Prior Album"), as determined by Company from its most recent monthly trial balance accounting statement as of the date twelve (12) months after the initial United States release of the Prior Album, after deduction of reserves for returns and credits not exceeding fifteen percent (15%) of the aggregate number of units of that Album shipped to Company's customers, and no such Recording Fund will be more than the applicable maximum or less than the applicable minimum amount prescribed below:

|  |  | Minimum | Maximum |
|---|---|---|---|
| (i) | Commitment Album Delivered in the first Option Period: | $500,000 | $1,000,000 |
| (ii) | Commitment Album Delivered in the second Option Period: | $500,000 | $1,000,000 |

145418AG.N03

9

Exhibit 2
79

(6)    In addition to the amounts specified in subparagraphs (1), (2), (3), (4) and (5) above, if you elect to record both EP Masters, Company will pay you an Advance of Eighty Thousand Dollars ($80,000), the receipt of which you hereby acknowledge; provided, that such amount will be recoupable solely from any and all record royalties otherwise payable to you under the Prior Agreement.

(b)    Each such Advance will be reduced by the amount of any reasonably anticipated costs of mastering, remastering, remixing and/or "sweetening"; any such anticipated costs which are deducted but not incurred will be remitted promptly to you, *provided that after delivery of each album, such remixing costs shall be fully recoupable but not deductible from the recording fund.*

(c)    The Advance for each Commitment Album other than the First Album will be made by payment to you of:

(i)    twenty-five percent (25%) of the applicable Recording Fund, as reduced pursuant to subparagraph 6.02(b), following the commencement of recording of the Commitment Album concerned; and

(ii)    the balance, if any, of the applicable Recording Fund will be paid to you as an Advance within thirty (30) days after the Delivery to Company of the Commitment Album concerned.

6.04.  (a)    Company guarantees to pay annual compensation ("Annual Payments") to each of the "Applicable Members" (as hereinafter defined) during each of the first seven (7) "Fiscal Years" (as hereinafter defined) of such amounts as are set forth in sections (1), (2) and (3) below.  Each of the Applicable Members hereby agrees to accept all such Annual Payments.  As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which this agreement is in effect, commencing with the date of commencement of the term of this agreement.  At least thirty (30) days before the end of each Fiscal Year, you shall notify Company in writing if each Applicable Member has not received compensation equal to the Annual Payment for such Fiscal Year and the amount of the deficiency, and Company will pay you the amount of the deficiency.

(1)    Nine Thousand Dollars ($9,000) for the first Fiscal Year of this agreement;

(2)    Twelve Thousand Dollars ($12,000) for the second Fiscal Year of this agreement; and

(3)    Fifteen Thousand Dollars ($15,000) for each of the third through seventh Fiscal Years of this agreement.

14641BAG.N03

10

Exhibit 2
80

(b)    You hereby warrant and represent that all payments made to you under this agreement during each Fiscal Year will be distributed equally among those members in whose names such payment is made (and for such purpose, any payment in the name of "The Pharcyde" shall be apportioned equally among all members of you; each such apportioned share of a payment is referred to as the "Appropriate Share". Each member of you hereby acknowledges that each Appropriate Share to which he is entitled pursuant to the foregoing shall be deemed received by him for purposes of California Civil Code Section 3423.

(c)    If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to the Applicable Members or allocated to the Applicable Members as an Appropriate Share under this agreement exceeds the Annual Payments due to the Applicable Members, such excess compensation shall apply to reduce the Annual Payments due to the Applicable Members for any subsequent Fiscal Years. You acknowledge and agree that the Advance payable to you pursuant to section 6.02(a)(2) above shall satisfy Company's obligation to pay to each Applicable Member Annual Payments in respect of the first four (4) Fiscal Years].

(d)    Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided that if this agreement expires or terminates prior to the end of a particular Fiscal Year, the applicable Annual Payment to each Applicable Member shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423. Any failure by Company to make an Annual Payment will not constitute a material breach of this agreement.

(e)    Company shall have the right to pay any Applicable Member or any other member of you at any time any additional amounts which may be required to be paid as a condition to Company's petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments"). Each member of you hereby agrees to accept any and all such Additional Payments. The Appropriate Share of all compensation (other than Mechanical Royalties) paid to you hereunder which is not applied to the Annual Payments theretofore due the Applicable Members will be credited toward satisfying the obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder. If Company actually makes any Additional Payments and thereafter elects not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

(f)    Each Annual Payment and Additional Payment, if any, will constitute an Advance and will be applied in reduction of any and all monies (other than Mechanical Royalties) due or becoming due you under this agreement. Notwithstanding anything to the contrary contained herein, whenever in this

146416A9.N03

11

Exhibit 2
81

agreement Company has the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due you under this agreement, Company's such right shall not extend to deducting such excess expenditures from any Annual Payments or Additional Payments.

(g)    As used in this agreement "Applicable Members" shall mean Romye Robinson, E. Imani Wilcox and Trevant Hardson.

7.    **RIGHTS IN RECORDINGS**

7.01.  (a)    All Master Recordings made or furnished to Company by you under this agreement or during its term from the Inception of Recording, and all matrices and Phonograph Records manufactured from them, together with the Performances embodied on them, all Covered Videos, and all artwork created for use in connection with the Phonograph Records hereunder ("Artwork") shall be the sole property of Company, free from any claims by you or any other Person; and Company shall have the exclusive right to copyright those Master Recordings, Covered Videos and Artwork in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world.  In connection therewith you hereby acknowledge that each Master Recording made or furnished to Company by you under this agreement or during its term, from the Inception of Recording, each Covered Video made hereunder, and all Artwork is a work made for hire for Company in that (a) it is prepared within the scope of Company's employment of you hereunder and/or (b) it constitutes a work specifically ordered by Company for use as a contribution to a collective work.  To the extent, if any, that you may be deemed an "author" of any such Master Recordings, Covered Videos or Artwork, you hereby grant to Company a power of attorney, irrevocable and coupled with an interest, for you and in your name, to apply for and obtain, and on obtaining same, to assign to Company all such copyrights and renewals and extensions thereof.  You will execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company in the Master Recordings, Covered Videos and Artwork subject to this agreement as Company may reasonably request to carry out the purposes of this agreement, and Company may sign such documents in your name and make appropriate disposition of them.

(b)    Upon your written request, Company shall grant you a non-exclusive license in the Artwork owned by Company on the following terms and conditions:

(i)    In connection with such license you shall have the right to license the Artwork to a third party for commercial merchandise (other than Phonograph Records) customarily sold in connection with the marketing and sale of

145418AG.N03                                    12

Exhibit 2
82

recorded music or at live concerts featuring your live musical performances. You will have no right to make any other use of the Artwork.

        (ii)   You will be required to obtain and deliver to Company, in advance: (1) all consents which Company may require and (2) all agreements by other persons which Company may require to look to you or your licensee, and not to Company for the fulfillment of any obligations arising in connection with your or your licensee's use of the Artwork.

        (iii)   No warranty of merchantability or fitness for a particular purpose or any other warranty or representation, express or implied, will be made by Company in connection with the Artwork or otherwise. You and your licensee shall indemnify and hold harmless Company and its licensees against all claims, damages, liabilities, costs and expenses, including reasonable attorneys fees, arising out of any use of the Artwork by you, and the licensee or any person deriving rights from the licensee.

        (iv)   You or your licensee shall cause Company's copyright notice to be affixed to each reproduction of the Artwork which you or your licensee makes or authorizes.

        (v)   Company shall have no obligation to license the Artwork to you if, in Company's sole, reasonable discretion, such license might subject Company to unfavorable regulatory action, violate and law, violate the rights of any person, or subject Company to liability for any reason.

        (vi)   If by reason of Company's license to you of the Artwork, Company incurs any obligation to make any payments to any other person, such payments shall be your sole responsibility and shall be paid by you promptly (or reimbursed by you if paid by Company). Such payments will also be recoupable from any monies becoming payable to you by Company under this agreement to the extent not so paid or reimbursed by you.

        (vii)   As consideration for this license provided for in this paragraph 7.01 (b), you will pay to Company fifty percent (50%) of the costs incurred by Company in connection with the creation of the Artwork promptly after Company has informed you of the amount of such cost. The license shall have no force and effect until such payment is made to Company.

        7.02. Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited, exclusive rights, throughout the world: (a) to manufacture Phonograph Records in any form and by any method now or hereafter known, derived from the Master Recordings and Covered Videos made under this agreement or during its term; (b) to sell, transfer or otherwise deal in the

145418A0 N03

13

Exhibit 2
83

same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing; and (c) to reproduce, adapt, and otherwise use those Master Recordings and Covered Videos in any medium and in any manner, including but not limited to use in audiovisual works.

7.03. You hereby irrevocably authorize, empower, and appoint Company your true and lawful attorney (a) to initiate and compromise any valid claim or action against infringers of Company's rights with respect to Covered Videos, Master Recordings and Artwork made under this agreement or otherwise furnished to Company by you; and (b) to execute in the your name any and all documents and/or instruments necessary or desirable to accomplish the foregoing. The power of attorney granted under this paragraph 7.03 is coupled with an interest and is irrevocable.

7.04. (Intentionally omitted.)

7.05 (a)    Notwithstanding anything to the contrary contained in this agreement, one or all of you (the "Solo Member") shall have the right to record a solo Album (a "Solo Album") embodying the featured performances of the Solo Member. Company will remain exclusively entitled to such Solo Member's recording services as a member of you. A Solo Member agreement with any third party for the Solo Member's solo recording services ("Third Party Solo Agreement"), shall not derogate Company's rights with respect to such Solo Artist, and such Solo Member's services hereunder shall be rendered on a first priority basis.

(b)    Each Solo Member that enters into a Third Party Solo Agreement shall instruct such third party that, if the First Album is not delivered to and accepted by Delicious Vinyl by September 30, 1998, that such third party will pay directly to Delicious Vinyl a royalty override of three percent (3%) on USNRC sales of such Solo Member's LP, which royalty shall be based on the same royalty base as is artist's royalty under the Third Party Solo Agreement, and shall be computed, adjusted, calculated, prorated, reduced and paid in the same manner as the artist's royalty is computed, adjusted, calculated, prorated, reduced and paid under the Third Party Solo Agreement.

8.    **MARKETING**

8.01. (a)    Subject to paragraph 7.05 above, Company and its Licensees shall have the perpetual and exclusive rights during the term of this agreement (and the non-exclusive rights thereafter) throughout the world and may grant to others the rights:

145418AG.N03

14

Exhibit 2
84

(1)     to use the names, portraits, pictures and likenesses of you and Producer(s) and all other Persons performing services in connection with Master Recordings and Covered Videos made under this agreement (including, without limitation, all past, present or future legal, professional, group, and other assumed or fictitious names used by you or them), and biographical material concerning you or them, as news or information, for the purposes of trade, or for advertising purposes, in any manner and in any medium in connection with the marketing and exploitation of Phonograph Records and Covered Videos hereunder, and institutional advertising (i.e., advertising designed to create goodwill and prestige and not for the purpose of selling any specific product or service), your career; and

(2)     to reproduce your names, portraits, pictures and likenesses (including, without limitation, all past, present or future legal, professional, group, and other assumed or fictitious names used by you) (collectively "Artist's Name and Likeness") on promotional merchandise (i.e., merchandise not intended for resale to consumers) of any kind, without payment of additional compensation to you or any other Person, in connection with the marketing and exploitation of Phonograph Records and Covered Videos hereunder, institutional advertising and your career.

(b)     During the term of this agreement you shall not authorize any Person other than Company (subject to the terms of paragraph 7.05 above) to use the Artist's Name and Likeness in connection with the advertising or sale of:

(1)     Phonograph Records; or

(2)     Blank recording tape or tape recording equipment, other than professional tape or equipment not intended for resale to consumers.

8.02.  You will cooperate with Company, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing you, the Recordings and Covered Videos made under this agreement, at Company's expense.

8.03.       (a)     Provided you have fulfilled all of your material obligations under this agreement, Company will release each Commitment Album Delivered hereunder in the United States within one hundred twenty (120) days after your Delivery to Company of such Album. If Company fails to do so your sole remedy shall be the right to notify Company, within sixty (60) days after the end of the one hundred twenty (120) day period concerned, that you intend to terminate the term of this agreement unless Company releases such Album within sixty (60) days after Company's receipt of your notice (the "Cure Period"). If Company fails to release such Album before the end of the Cure Period you may terminate the term of this agreement by giving Company notice within sixty (60) days after the end of the Cure Period. On receipt by Company of your termination notice the term of this agreement

146418AC.N03                                    15

Exhibit 2
85

will end and all parties will be deemed to have fulfilled all of their obligations under it except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions, audit rights and the obligation to account and pay royalties). If you fail to give Company either of those notices within the period specified, your right to terminate will lapse.

(b)    The running of the one hundred twenty (120) day and sixty (60) day periods referred to in subparagraph 8.03(a) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the term of this agreement under paragraph 15.03. If any such one hundred twenty (120) day or sixty (60) day period would otherwise expire on a date between November 1 and the next January 16, its running will be suspended for the duration of the period between November 1 and January 16 and its expiration date will be postponed by the same amount of time. A Commitment Album will be deemed released, for the purposes of this paragraph 8.03, when Company has announced its availability for sale in the United States.

8.04.  If Company decides to produce one (1) or more Covered Videos during the term hereof (which Company is under no obligation whatsoever to do, except as otherwise provided in paragraph 8.04(f) below), the following shall be applicable:

(a)    With respect to Covered Videos made in connection with the initial release of a Commitment Album, you and Company shall mutually designate the selection(s) to be embodied in each Covered Video and each such Covered Video shall be shot based on a concept or script approved by Company.

(b)    Each Covered Video shall be shot on a date or dates and at a location or locations to be designated by Company, subject to your reasonable prior professional commitments.

(c)    Company shall engage the producer, director and other production personnel for each Covered Video, and shall be responsible for and shall pay the production costs of each Covered Video in an amount not in excess of a budget to be established in advance by Company (the "Production Budget"). You shall be responsible for and shall pay the production costs for each Covered Video which are in excess of the Production Budget.  In the event that Company shall pay any production costs for which you are responsible pursuant to the foregoing sentence (which Company is in no way obligated to do), you shall promptly reimburse Company upon Company's request, and all such costs not reimbursed will constitute Advances and may be recouped by Company from any monies otherwise payable by Company to you hereunder.  Your compensation for performing in such Covered Videos (as opposed to your compensation with respect to the exploitation of such Videos which is provided elsewhere in this agreement) shall be limited to any minimum amounts required to be paid for such Performances pursuant to any collective bargaining

Exhibit 2
86

agreements pertaining thereto; provided, however, that you hereby waive any right to receive such compensation to the extent such right may be waived.

(d)    As set forth in paragraph 12.02 below, you shall issue (or shall cause the music publishing company[ies] having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) perpetual licenses for public performance in the United States (to the extent that ASCAP and BMI are unable to issue same), to Company at no cost for the use of all Controlled Compositions in any such Covered Videos effective as of the commencement of production of the applicable Covered Video (and your execution of this agreement shall constitute the issuance of such licenses by any music publishing company[ies] which is owned or controlled by you or by any Person owned or controlled by you). If you shall fail to cause any such music publishing company[ies] to issue any such license to Company, or if Company shall be required to pay any fee to such music publishing company[ies] in order to obtain such license, then Company shall have the right to deduct the amount of such license fee from all monies becoming due to you under this agreement.

(e)    Each Covered Video shall be deemed an item of "Materials" covered by your warranties, representations and indemnification obligations under Article 13. Company will have the right to reject any Covered Video or any element contained in a Covered which in Company's reasonable, good faith opinion is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Company to liability or unfavorable regulatory action.

(f)    Provided you are not in material breach of this agreement, Company agrees to produce not less than two (2) Covered Videos in connection with each Commitment Album Delivered and released hereunder, subject to a budget therefor to be mutually determined in good faith by Company and you; provided that the budget for the first Covered Video from the First Album shall not be less than One Hundred and Fifty Thousand Dollars ($150,000), and the budget for the second Covered Video from the First Album shall not be less than One Hundred Thousand Dollars ($100,000). Notwithstanding the foregoing, Company will not be required to produce Covered Videos hereunder if at any time Company no longer produces Audio-Visual Records as a promotional tool for a majority of Company's then-current artists.

8.05. During the term of this agreement, in respect of Records, other than Audiovisual Records, manufactured for sale in the United States, Company will not without your consent and notwithstanding anything in Article 9 (provided that Company's inadvertent failure to comply with the provisions of this paragraph 8.04 will not constitute a breach of this agreement):

Exhibit 2
87

(a) Couple more than once during any one year period more than one particular Master Recording made or furnished under this agreement with Recordings not embodying your Performances, except on promotional Records, Records described in the last sentence of paragraph 10.03 and Records created by Company's special products operations for sale primarily to educational institutions.

(b) License Master Recordings for use in political advertisements or for advertisements for pork products.

(c) Sell any Commitment Album as "cut-outs" within two (2) years after the initial release of the Master Recording concerned on Phonograph Records in the United States.

(d) Sell any Commitment Album as a Budget Record within eighteen (18) months after its initial United States release.

(e) Sell any Commitment Album as a Mid-price Record within twelve (12) months after its initial United States release.

(f) Couple any Covered Videos with videos featuring the performances of other artists.

(g) Sell Records described in section 9.02(a)(3) below.

(h) Release as a "B-side" of any Single a Master Recording rejected by you for such purpose.

(i) Promotionally or commercially exploit any Master Recording remixed by a remix producer disapproved by you (and Company will not recoup from you any costs, with respect to any remix produced by any remix producer who is not so approved by you); provided, that you will not utilize such right of approval to thwart Company's right to remix Master Recordings hereunder).

(j) Use Master Recordings made under this agreement on "Premium Records" without your consent and notwithstanding anything in Article 9. (A "Premium Record" is a Record produced for use in promoting the sale of merchandise other than Phonograph Records.)

8.06. Company will not release "outtakes" on Phonograph Records without your consent. ("Outtakes" are preliminary, unfinished, or alternative versions of Master Recordings made under this agreement.)

145418AG.N03

18

Exhibit 2
88

## 8A. PERSONAL APPEARANCE TOUR ARRANGEMENTS

8A.01. If you undertake a personal appearance tour of at least fifteen (15) major Phonograph Record markets in the United States in connection with the initial release of the first Commitment Album of the initial Contract Period, then:

(a)     Within a reasonable time before the plans for the tour are completed, you will notify Company of a complete itinerary, specifying the details of each engagement (including the time and place of each appearance). The itinerary (and each item thereof) will be subject to Company reasonable approval.

(b)     Only if Company approves of the tour (acting reasonably pursuant to (a) above) and each item of the itinerary (and thereafter there is no substantial change of any element thereof without Company's prior written consent), then, provided such tour is completed in accordance with the approved itinerary, Company will pay you that amount, if any, by which your direct expenses actually incurred in connection with the tour exceed your revenues for such tour ("Tour Shortfall"), but not more than Fifty Thousand Dollars ($50,000). Said payment will constitute an Advance and will be recoupable form all royalties (except Mechanical Royalties) becoming payable by Company to you and will be made upon Company's receipt of documentation of the tour expenses and revenues satisfactory to Company. If Company approves the shortening of any such tour, the amount set forth in the first sentence of this subparagraph will be reduced by the amount of the Tour Shortfall specifically attributable to each market deleted from the itinerary.

## 8B.   GREATEST HITS ALBUMS

8B.01     Company will not, without your consent, release more than two (2) "greatest hits", "anthology" or "best-of" type Albums (any such Album individually a "GHLP" and collectively "GHLPs"). Such GHLPs may, at Company's election, include Master Recordings recorded pursuant to the Prior Agreement. With respect to such GHLPS, Company will advance you One Hundred Thousand Dollars ($100,000) upon the initial United States commercial release of the first GHLP, and One Hundred Thousand Dollars ($100,000) upon the initial United States commercial release of the second such GHLP; provided, that the payment of any such Advance will be conditioned upon your recording and Delivery to Company of up to two (2) (at our election) additional Master Recordings ("Greatest Hits Masters") in connection with any such GHLP, subject to Company's request therefor, within sixty (60) days following Company's such request. Company will pay directly all Recording Costs in connection with such Greatest Hits Masters, subject to a budget therefor mutually agreed to by you and Company; provided, that any recording costs in excess of such budget will be recoupable from any and all monies otherwise payable to you hereunder. If you do not so Deliver all such Greatest Hits Masters, then Company will

145418AG.N03

19

Exhibit 2
89

have no obligation to pay you the otherwise-applicable advance with respect to the particular GHLP concerned.

9.    **ROYALTIES**

9.01.  Company will pay you a royalty computed at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records consisting entirely of Master Recordings recorded under this agreement during the respective Contract Periods specified below and sold by Company or its Licensees Through Normal Retail Channels ("NRC Net Sales"). (Such royalty shall include your royalties and all royalties payable to all other artists, Producers and other Persons which become or may become due by reason of the recording and/or exploitation of Master Recordings recorded under this agreement, other than "per-record royalties" pursuant to subparagraph 5.02(c) above.) The royalties payable pursuant to the provisions of paragraphs 9.01, 9.02, 9.03, 9.04, and 9.05 and the provisions of Article 10 shall apply to all Phonograph Records except Audiovisual Records.  The royalties payable pursuant to the provisions of paragraph 9.06 shall apply solely to Audiovisual Records.

(a)    ON ALBUMS SOLD FOR DISTRIBUTION IN THE UNITED STATES:

(1)    (i)    Master Recordings made during the initial Contract Period: 17%.

(ii)    The royalty rate pursuant to subsection 9.01(a)(1)(i) will apply to the first 500,000 units of NRC Net Sales in the United States ("USNRC Net Sales") of each Album consisting of Master Recordings made during the initial Contract Period [or first Option Period].  The royalty rate will be:

(A)    17.5% on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B)    18% on USNRC Net Sales of any such Album in excess of 1,000,000 units.

(2)    (i)    Master Recordings made during the first Option Period: 17.5%.

(ii)    The royalty rate pursuant to subsection 9.01(a)(2)(i) will apply to the first 500,000 units of USNRC Net Sales of each Album consisting of Master Recordings made during the second and third Option Periods.  The royalty rate will be:

145418AG.N03

20

Exhibit 2
90

(A)     18% on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B)     18.5% on USNRC Net Sales of any such Album in excess of 1,000,000 units.

(3)     (i)     Master Recordings made during the second Option Period: 18%.

(ii)     The royalty rate pursuant to subsection 9.01(a)(2)(i) will apply to the first 500,000 units of USNRC Net Sales of each Album consisting of Master Recordings made during the second and third Option Periods. The royalty rate will be:

(A)     18.5% on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B)     19% on USNRC Net Sales of any such Album in excess of 1,000,000 units.

(4)     As used herein, the "Base U.S. Album Royalty Rate" for a particular Album Delivered hereunder (and each Master Recording embodied therein) shall mean a royalty rate equal to the royalty rate for the first USNRC Net Sale of such Album on a configuration-by-configuration basis.

(5)     The only Net Sales to be considered for the purposes of escalating the royalty rates pursuant to sections 9.01(a)(1) and 9.01(a)(2) above shall be USNRC Net Sales. Without limiting the foregoing, Net Sales subject to the remainder of Articles 9 and 10 hereof [other than those USNRC Net Sales referred to in subparagraph 9.03(b) below] shall not be considered for the purposes of such escalations. None of the foregoing escalations shall result in an increase in any royalty rates contained herein other than for USNRC Net Sales under sections 9.01(a)(1), 9.01(a)(2) and 9.01(a)(3) above and subparagraph 9.03(b) below, even though other royalty rates may be based on the royalty rates set forth in those paragraphs.

(b)     ON ALBUMS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

(1)     On Albums Delivered hereunder and sold for distribution in Canada: eighty-five percent (85%) of the Base U.S. Album Royalty Rate;

(2)     On Albums Delivered hereunder and sold for distribution in Japan, Australia, New Zealand and those countries constituting the European

145418AG.N03

21

Exhibit 2
91

Economic Community as of the date hereof (the "EEC"), seventy-five percent (75%) of the Base U.S. Album Royalty Rate; and

   (3) (Intentionally omitted.)

   (4) On Albums Delivered hereunder and sold for distribution in the rest of the world: sixty-six and two-thirds percent (66%) of the Base U.S. Album Royalty Rate.

  (c) ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION IN THE UNITED STATES: twelve percent (12%). As used herein, the "Base U.S. Single Royalty Rate" shall mean twelve percent (12) %.

  (d) ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

   (1) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in Canada: eight-five percent (85%) of the Base U.S. Single Royalty Rate;

   (2) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in the Japan, Australia, New Zealand and the EEC: seventy-five percent (75%) of the Base U.S. Single Royalty Rate;

   (3) (Intentionally omitted.)

   (4) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in the rest of the world: sixty-six and two-thirds percent (66⅔%) of the Base U.S. Single Royalty Rate.

If any Company Licensee accounts to Company on the basis of less than one hundred percent (100%) of Net Sales, Company will account to you for the Records concerned on the same basis.

  9.01.1. Notwithstanding anything to the contrary contained in this agreement, with respect to Records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of Records sold in such territory(ies), the royalty payable hereunder shall equal the lesser of: (a) the applicable royalty payable under subparagraph 9.01 (b) or (d); or (b) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to three (3%) percent of the retail list price and such monies as Company or its Licensees shall be

145416A0.NO3.

22

Exhibit 2
92

required to pay to all applicable union funds in respect of said sales, divided among you and Company in the same ratio as that among your and Company's basic royalty percentage ratio.

9.02.        (a)        The royalty rate on any Record described in section (1), (2), or (3) of this sentence will be one-half (1/2) of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels: (1) any catalog Phonograph Record sold by the special products operations of Company or its Licensees ("SPO's") to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes (but not for sale to the general public Through Normal Retail Channels); (2) any Phonograph Record sold outside the United States by Company or its Licensees in the country concerned in conjunction with a substantial radio or television advertising campaign during the calendar semi-annual period in which that campaign begins or either of the next two (2) such periods; and (3) any non-catalog Phonograph Record created on a custom basis for SPO clients. The royalty on any Record described in section (3) will be computed on the basis of the SPO's actual sales price less all taxes and Container Charges.

(b)        In respect of any Master Recording: (1) leased by Company or its Licensees to others for their distribution of Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Company's Licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called "record clubs"); or (3) embodied on Phonograph Records sold by Company's Licensees in the United States through retail stores in connection with special radio or television advertisements (sometimes referred to as "key-outlet marketing"), Company will pay you fifty percent (50%) of Company's net receipts with respect to such exploitation. ("Net receipts", in the preceding sentence, means Company's gross receipts as computed after deduction of all AFM, union and other applicable third party payments actually made or incurred; provided, however, if Company's net receipts from such sales are inclusive of manufacturing costs and/or Mechanical Royalties for the applicable Record[s] hereunder, your royalty shall instead be one-half (1/2) of the otherwise applicable royalty rate hereunder.) If another artist, a Producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates. No royalties shall be payable with respect to Records given away as "bonus" or "free" Records as a result of joining a record club or purchasing a number of Records from a record club or in connection with any introductory, incentive or other offer made by a record club.

(c)        (1)        If Company or it's Distributor sells Records directly (and not through other Licensees) via television and/or radio advertisements or through mail or phone order in the United States, then such sales for the purposes of subparagraph 9.01 (a) hereof shall be deemed USNRC Net Sales and, accordingly, you shall be paid royalties with respect thereto in accordance with subparagraph 9.01(a)

145416AG.N03                              23

Exhibit 2
93

hereof, but only with respect to eighty-five percent (85%) of such Net Sales, less the applicable Container Charge.

(2)    If Company or its Distributor licenses third parties to sell Records via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, the royalty rate will be the otherwise applicable royalty rate prescribed in paragraph 9.01 but, for purposes of calculating royalties payable in connection with such sales, the retail list price of such Records shall be deemed to be the then-current retail list price of analog tape copies of such Records and in the case of Records which have no analog tape equivalent, the corresponding price of the vinyl disc (but in the United States, eighty five percent (85%) of the then current retail list price of such tape copies or corresponding vinyl disc), less the Container Charge which applies to analog tape copies; provided, however, with respect to Records sold by Company's or its Distributor's Licensees, in no event shall your royalty exceed one-half (1/2) of Company's net receipts after deduction from Company's gross receipts of union and all other applicable third party payments actually made or incurred by Company.

9.03.  (a)    The royalty rate on any Budget Record, any Premium Record or any "picture disc" (i.e., a disc phonorecord with artwork reproduced on the surface of the Record itself) will be one-half (1/2) of the applicable royalty rate prescribed in paragraph 9.01. The royalty rate on any Record sold for distribution through military exchange channels will be two-thirds (2/3) of the applicable royalty rate prescribed in paragraph 9.01. The royalty rate on any Mid-price Record will be two-thirds (2/3) of the applicable royalty rate prescribed in paragraph 9.01. The royalty on any Premium Record or Record sold for distribution through military exchange channels will be computed on the basis of the actual sales price (or Post Exchange list price where applicable) less all taxes and Container Charges.  The royalty rate on any Record which is not an Album, a Single, a Twelve-Inch Single, or an Extended Play Record will be one-half (1/2) of the applicable Album royalty rate prescribed in paragraph 9.01.

(b)    The royalty on any New Medium Record will be a royalty computed at seventy percent (70%) of the rate which would otherwise apply under this agreement.

(c)    The royalty rate on a Multiple Record Set will be the otherwise applicable royalty rate multiplied by a fraction (which shall in no event be larger than one (1)), the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the territory where the Multiple Record Set is sold and the denominator of which is Company's then-prevailing SRLP for Company's newly-released Top-line Albums in such configuration in the applicable territory multiplied by the number of Records contained in such Multiple Record Set.

14541BA8.N03

24

Exhibit 2
94

9.04. In respect of Phonograph Records derived from Master Recordings furnished by Company or its Licensees to others for their manufacture and distribution of Records outside the United States, Company will pay you fifty percent (50%) of the amount which would be payable to you for those Records under subparagraph 9.01(b) or (d) if they were manufactured and distributed by Company or its Licensees.

9.05. If Company authorizes the use of any Master Recording made under this agreement on a flat fee basis, royalty rate or cent rate basis for any type of use not specifically covered elsewhere in this Article 9, (such as, but not limited to, use in a commercial or motion picture other than a Covered Video), it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts attributable directly to that use. "Net receipts", in the preceding sentence, means Company's gross receipts as computed after deduction of all payments required to be made by Company to others in connection with those uses (for example, re-use payments under Company's agreements with the American Federation of Musicians). If another recording artist, a Producer, or any other Person is entitled to royalties on such uses, the amount to be credited under this paragraph will be apportioned in the same ratio as that among your respective basic royalty percentages. If any item of such receipts is attributable to Master Recordings made under this agreement and other Master Recordings, the amount of that item included in gross receipts under this paragraph will be computed by apportionment on the basis of the number of Master Recordings involved.

9.06. Company will pay you royalties as follows in connection with the following uses of Audiovisual Records (including for sales of Audiovisual Records which contain Covered Videos):

(a)    (1)    Company will pay you a royalty (the "Net Receipts Royalty") in the amount equal to fifty percent (50%) of Company's "Net Video Receipts" (defined below) derived from all uses of Audiovisual Records which produce revenues directly for Company other than the sales described in subparagraph 9.06(b) below.

(2)    "Gross Receipts", in this subparagraph 9.06(a), means all monies actually received by Company (or credited to Company's account against advances previously received) in the United States which are specifically allocated to the exploitation of Audiovisual Records. "Net Video Receipts" means Gross Receipts, less all direct out-of-pocket expenses, taxes, adjustments, and collection costs incurred by Company in connection with the exploitation of such Audiovisual Records, all payments required to be made to Persons other than you or any other "Royalty Participant" (as hereinafter defined), including, without limitation, to unions or guilds or to publishers of non-Controlled Compositions and "Independent Interests" (as hereinafter defined) in Controlled Compositions in connection with the production and/or exploitation of such Audiovisual Records and any Covered Videos embodied

Exhibit 2
95

therein, and a distribution fee equal to thirty percent (30%) of those Gross Receipts. Any item of expenses which is actually recouped from Gross Receipts under this section will not be chargeable against royalties under paragraph 5.02. If any item of revenue or expenses is attributable to an Audiovisual Record or a Covered Video and to other audiovisual works, the amount of that item included in Gross Receipts or deductible in computing Net Video Receipts will be determined by apportionment based on actual playing time of the Record concerned.

        (3)    You shall be solely responsible for and shall pay any and all monies payable to the Producers, to the producers and directors of the visual portion of the Audiovisual Records or Covered Videos, to the publishers of Controlled Compositions and to any other Persons (except publishers of non-Controlled Compositions or of Independent Interests in Controlled Compositions which are embodied in the Audiovisual Records or Covered Videos and any unions or guilds or their funds) who are entitled to a royalty or any other payment in respect of the exploitation of the Audiovisual Records (each such person being herein referred to as a "Royalty Participant"). Notwithstanding the foregoing, if Company shall pay or be required to pay any such monies directly to any Royalty Participant, then Company shall have the right to deduct same from any and all royalties payable to you hereunder.

        (b)    If Company or Company's Distributor manufactures and distributes Audiovisual Records embodying one or more Covered Videos, then, Company will pay you royalties at the rates and in the manner set forth in this subparagraph 9.06(b), rather than the Net Receipts Royalty payable to you pursuant to subparagraph 9.06(a).

        (1)    On Net Sales of Audiovisual Records distributed in the United States: fifteen percent (15%) of the applicable Royalty Base Price for such Audiovisual Records, and on Net Sales of Audiovisual Records distributed outside of the United States: ten percent (10%) of the applicable Royalty Base Price for such Audiovisual Records.

        (2)    The royalty rate payable to you on any Audiovisual Record containing a Covered Video and other audiovisual works will be determined by apportionment based on actual playing time on the Record concerned.

        (3)    The provisions of paragraph 10.03 shall be applicable to sales of Audiovisual Records under this subparagraph 9.06(b).

        (4)    The royalties payable in accordance with this subparagraph 9.06(b) shall be inclusive of all royalties that may be payable to all Persons (other than unions or guilds and their funds), including, without limitation Royalty Participants and the publishers of both Controlled Compositions and non-

Exhibit 2
96

Controlled Compositions or Independent Interests. If Company makes any payments to any Person with respect to any such Audiovisual Record, then Company shall have the right to deduct such payments from royalties otherwise payable to you with respect to Audiovisual Records.

## 10. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Article 9:

10.01.    In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

10.02.    The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying Master Recordings made hereunder and the denominator of which is the total number of royalty-bearing Sides contained on such Record.

10.03.    No royalties will be due or payable in respect of Phonograph Records: (a) sold (for less than 50% of Company's posted wholesale price), distributed or furnished on a no-charge basis by Company or its Licensees for promotional purposes (including, without limitation, Records to disc jockeys, publishers, motion picture companies, television and radio stations, and other customary recipients of promotional Records) or to Company's or its Licensees' employees and relatives; (b) sold, distributed or furnished on a no-charge basis to members, applicants or other participants in any "record club" or other direct mail distribution method; (c) sold at close-out prices or as surplus, overstock or scrap; (d) sold as cutouts after the listing of such Records has been deleted from the catalog of Company or its Licensees; (e) given away or shipped as "free", "no charge" or "bonus" Records (whether or not intended for resale); and (f) sold at a discount from the Record's posted wholesale list price (but for more than 50% of such price), whether or not intended for resale. No royalties will be payable to you on Records containing Recordings of not more than two (2) Master Recordings made hereunder sold as "samplers" at a price which is fifty percent (50%) or less of the SRLP of Company's then current newly-released Top-line Records, on Records intended for free distribution as "samplers" to automobile or audio and/or audiovisual equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

Exhibit 2
97

10.04.    Those Records distributed pursuant to subparagraphs 10.03(e) and (f) above are herein referred to as "Free Goods." The parties hereto expressly understand and agree that Company shall not have the right to distribute Free Goods without paying royalties on such Records as if such Records were Net Sales hereunder (other than in accordance with the immediately subsequent sentence); provided, that if at any time Company's distributor has a policy of distributing the equivalent of Free Goods (other than the equivalent of "Special Free Goods" as such term is defined below), then (notwithstanding anything to the contrary contained in paragraph 14.08 below), such Free Goods will not be in excess of fifteen percent (15%) of all Top-line Albums, and twenty-three percent (23%) for all Top-line Singles distributed under this agreement.    Notwithstanding the foregoing, from time to time, Company or its Distributor, jointly or separately, shall have the right to conduct special sales programs of limited duration which include the distribution of Free Goods with respect to which no royalties of any kind will be paid ("Special Free Goods"), which Special Free Goods will, solely with respect to Albums, in no event exceed ten percent (10%) of the aggregate units of all Top-line Albums distributed under this agreement.  If Company distributes any Free Goods in excess of the foregoing limitations, Company will not be in breach hereof, but Company will pay you your normal royalty on such excess.

10.05.    If legislation requiring the payment of copyright royalties for the public performance of Phonograph Records is enacted in the United States and Company receives such royalties with respect to Master Recordings produced under this agreement, and you do not receive or waive any similar payment from anyone other than Company, then Company will credit your royalty account with that portion of such royalties as required (e.g., by law, applicable collective bargaining agreement, etc.), less any portion thereof which is payable by Company to Producers or any other Person; provided, that if you receive payment in respect thereof from any other Person, then Company shall credit your royalty account with such amount as shall provide you with a total (including the share received by you from any other Person) equal to one-half (1/2) of the aggregate amount paid to Company, you less any portion thereof which is payable by Company to any Producers or any other Person.

## 11. ROYALTY ACCOUNTINGS

11.01.    Company will compute your royalties as of each May 31st and November 30th (or such other semi-annual periods as Company may elect in its sole discretion) for the prior six (6) months, in respect of each such six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you, or liquidations of reserves established previously. Within three (3) months following the end of each such semi-annual period, Company will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances and chargeable costs under this agreement and such amount, if any, which Company may be required to withhold

145410AG.N03                                28

Exhibit 2
98

pursuant to the California Revenue and Taxation Code, the U.S. Tax Regulations or any other applicable statute, regulations, treaty or law. After the term, no royalty statements shall be required for periods during which no additional royalties accrue unless you give Company a written request therefor before the expiration of the semi-annual accounting period to which the desired royalty statement relates. In computing the number of Records sold, only Records for which Company has been paid shall be deemed sold, and Company shall have the right to deduct returns and credits of any nature and to withhold reasonable reserves therefor from payments otherwise due you. If Company makes any overpayment to you, you will reimburse Company for it; Company also may deduct it from any payments due or becoming due to you. If Company pays you any royalties on Records which are returned later, those royalties will be considered overpayments. Company may at any time elect to utilize a different method of computing royalties so long as such method does not decrease the net monies received by or credited to you hereunder.

11.02.    Sales of Records for distribution outside the United States are called "foreign sales". Company will compute your royalties for any foreign sale in the same national currency in which Company's Licensee pays Company for that sale, and Company will credit those royalties to your account at the same rate of exchange at which the Licensee pays Company. For purposes of accounting to you, Company will treat any foreign sale as a sale made during the same six month period in which Company receives its Licensee's accounting and payment for that sale. If any Company Licensee deducts any taxes from its payments to Company, Company may deduct a proportionate amount of those taxes from your royalties. If any law, any government ruling, or any other restriction affects the amount of the payments which a Company Licensee can remit to Company, Company may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to Company. If Company cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale.

11.03.    Company will maintain books and records which report the sales or other exploitations of Phonograph Records and Master Recordings hereunder on which royalties are payable to you. You may, at your own expense, designate a certified public accountant ("CPA") to examine those books and records, as provided in this paragraph only. Such examination: (a) may be made only under paragraph 11.01; (b) may be made for a particular statement only once and only within two (2) years after the date when Company sends you that statement; and (c) may be made only during Company's usual business hours, and at the place where it keeps the books and records to be examined, and upon reasonable notice to Company. (Company will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 11.01 unless you notify Company otherwise, with respect to any statement, within sixty (60) days after that date.) No examination may be made of any manufacturing records or any other records that do not specifically report sales

29

146418AG.N03

Exhibit 2
99

or other distributions of Phonograph Records or other transactions on which royalties are payable to you. Further, such examination shall be conditioned upon the CPA's written agreement to Company that the CPA will not voluntarily disclose any findings to any Person other than you, your attorney or other advisers.

11.04.    If you have any objections to a royalty statement, you will give Company specific notice of that objection and your reasons for it within two (2) years after the date that Company is deemed to have sent you that statement under paragraph 11.03. Each royalty statement will become conclusively binding on you at the end of that two (2) year period, and you will no longer have any right to make any other objections to it. You will not have the right to sue Company in connection with any royalty accounting, or to sue Company for royalties on Records sold or receipts derived by Company during the period a royalty accounting covers, unless you commence the suit within that one-year period. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this agreement or avoid the performance of your obligations under it by reason of any such claim.

## 12.    LICENSES FOR MUSICAL COMPOSITIONS

12.01.    (a)    (1)    You grant to Company and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this agreement, other than Audiovisual Records, and to distribute them in the United States and Canada.

(2)    For that license, Company will pay Mechanical Royalties, on the basis of Net Sales, at the following rates (the "Controlled Rate"):

(i)    (A)    On Records sold for distribution in the United States: The rate equal to seventy-five percent (75%) (the "Percentage") multiplied by the minimum compulsory license rate (the "Minimum Statutory Rate") applicable to the use of Compositions on phonorecords under the United States copyright law on whichever of the following dates is the earlier:

(AA)    The date of completion of Delivery of the Master Recordings constituting the Album project (or other recording project)

145418AG.N03

30

Exhibit 2
100

be calculated according to the following formula:

$$(A \times B) + (P \times A)(C-B)$$

where "A" = the Minimum Statutory Rate, "B" = the actual number of non-Controlled Compositions on the Album plus the total fractional interest thereof (not to exceed two [2] for purposes of this calculation), C = the total number of Compositions on the Album (for purposes of this calculation, not to exceed ten (10) [but eleven (11) solely with respect to sales of Commitment Albums in compact disc form], and "P" = the Percentage.

(c)    Company will compute Mechanical Royalties on Controlled Compositions as of each February 28th (or 29th, if applicable), May 31st, August 31st and November 30th (or such other quarter-annual periods as Company may elect in its sole discretion) for the prior three (3) months, in respect of each quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you, or liquidations of Mechanical Royalty reserves established previously. On the 15th day of the second month following the end of each such quarter-annual period, Company will send a statement covering those Mechanical Royalties, less a reasonable reserve against anticipated returns and credits, and will pay any net Mechanical Royalties which are due. Mechanical Royalty reserves maintained by Company against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. If Company makes any overpayment of Mechanical Royalties to you or any Person you will reimburse Company for it; Company may also recoup it from any payments due or becoming due to you hereunder. If Company pays any Mechanical Royalties on Records which are returned later, those Mechanical Royalties will be considered overpayments. If the total amount of the Mechanical Royalties which Company pays on any Record consisting of Master Recordings made under this agreement (including Mechanical Royalties for Compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under subparagraph 12.01(b), that excess amount will be considered an overpayment also. Paragraphs 11.03 and 11.04 will apply to Mechanical Royalty accountings.

12.02.    You also grant to Company and its Licensees and their designees an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos and Audiovisual Records, to reproduce those Covered Videos and Audiovisual Records, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual Records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so. Company will not be required to make any payment in connection with those uses, and that license will apply whether or not Company receives any payment

145418AG:N03                            32

Exhibit 2
101

in connection with any use of any Covered Video or Audiovisual Record. If any exhibition of a Covered Video or Audiovisual Record is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this agreement. (In all events, Company and its Licensees will have no liability by reason of any such exhibition.)

12.03.    (a)    If any Recordings made under this agreement contain copyrighted Compositions which are not Controlled Compositions, you will use reasonable efforts to obtain licenses covering those Compositions for Company's benefit on the same terms as those which apply to Controlled Compositions under this Article 12. In all events, subparagraph 12.01(b) will continue to apply.

(b)    You will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to Company or its Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

12.04.    You warrant and represent that the **"Schedule of Publishers"** appended to this agreement is a complete list of the music publishers in which you have a direct or indirect interest. You will notify Company promptly of each additional music publisher in which you acquire any such interest and of every other change required to keep the list currently accurate.

12.05.    Neither you, nor any Person deriving rights from you, will authorize the use of any Controlled Composition in a radio or television commercial or any other advertising or promotional matter, unless you first require the Person authorized to make the use concerned to agree in writing, for Company's benefit, that the use will not involve a "sound-alike" Recording resembling a Performance of that Composition by you. (A "sound-alike" Recording is a different Recording which imitates or simulates the Recording concerned by using a substantially similar musical arrangement or otherwise.)

12.06.    If the copyright in any Controlled Compositions is owned or controlled by a Person other than you, you shall cause that Person to grant Company and its Licensees and their designees the same rights as you are required to grant to Company and its Licensees pursuant to this Article 12. Any assignment, license or other agreement made with respect to any Controlled Composition shall be subject to the terms hereof.

12.07.    You also grant to Company and its Licensees and their designees an irrevocable license under copyright to print and reproduce, at their election, the title

14541BAG.N05                              33

Exhibit 2
102

and lyrics to any Controlled Composition on Album Artwork and in connection with Covered Videos or Audiovisual Records, and the packaging therefor, throughout the world in perpetuity, without payment to you or any other Person of any monies or other consideration in connection therewith.

13.   **WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES**

13.01.   You warrant and represent:

(a)   You have the right and power to enter into and fully perform this agreement.

(b)   Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this agreement except as specifically provided in this agreement.

(c)   You are or will become and will remain, to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of the your services hereunder.

(d)   No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person. "Materials", as used in this Article, means: (1) the Master Recordings made or furnished under this agreement, (2) all Controlled Compositions, (3) each name used by you, individually or as a group, in connection with Recordings made hereunder, and (4) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you or any Producer and contained in or used in connection with any Recordings made hereunder or their packaging, sale, distribution, advertising, publicizing or other exploitation, including, without limitation, all label copy and liner note information provided by you.

(e)   No Person other than Company has any right to use any existing Master Recordings of your Performances for making, promoting, or marketing Phonograph Records.

(f)   Each and every vocalist, musician, Producer and other individual whose services you furnish in connection with the preparation of a Master Recording or Covered Video under this agreement either will have done so as an employee within the scope of his or her employment or will have expressly agreed in a written instrument signed by him or her and by the party commissioning the services that the Recording or Covered Video, as applicable, will be considered a "work made

145418AG.N03

34

Exhibit 2
103

for hire." A copy of any and all such instruments will be furnished to Company upon the request of Company.

13.02.    (a)    You warrant and represent that during the term of this agreement:

(1)    You will not enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder;

(2)    No Person other than Company will be authorized to use any existing Master Recordings of your Performances for making, promoting, or marketing Phonograph Records; and

(3)    During the term hereof, you will not perform or render any services as a recording, performing and/or video artist, or a producer for the purpose of making, promoting, or marketing Master Recordings or Phonograph Records for any Person except Company.

(b)    (1)    A "restricted Composition", for the purposes of this subparagraph, is a Composition which shall have been recorded by you for a Master Recording made or delivered to Company under this agreement or any other agreement with Company.

(2)    You will not authorize or knowingly permit your Performance, and you shall not render any Performance, of any restricted Composition or any adaptation of a restricted Composition to be recorded for any Person except Company for the purpose of making Master Recordings or Phonograph Records, or for any other purpose (including, without limitation, radio or television commercials), at any time before the later of the following dates: (i) the date five (5) years after the date of Delivery to Company of all the Master Recordings made in the course of the same Album (or other) recording project as the Recording of the restricted Composition concerned, or (ii) the date two (2) years after the expiration or termination of the term of this agreement or any subsequent agreement between Company and you (or any Person furnishing your recording services or the results and proceeds thereof) with respect to your recording services.

(c)    You shall not authorize or knowingly permit the your Performances to be recorded for any purpose without an express written agreement with the Person for whom the Recording is to be made, for Company's benefit, prohibiting the use of such Recording for making, promoting, or marketing Master Recordings or Phonograph Records in violation of the restrictions prescribed in

145418AG.N03

35

Exhibit 2
104

subparagraphs 13.02(a) and 13.02(b). You will furnish Company with a fully executed counterpart of each such agreement promptly after its execution.

13.03.    You warrant and represent that if you become aware of any unauthorized recording, manufacture, distribution, sale, or other activity by any third party contrary to the restrictions in this agreement, you will notify Company of it and will cooperate with Company in any action or proceeding Company commences against such third party.

13.04.    (a)    During the term of this agreement you will not render any musical Performances (audiovisual or otherwise) for the purpose of making any motion picture or other audiovisual work consisting primarily of your musical Performances together with a visual rendition of the your Performances or any other visual accompaniment, including a dramatization of any Composition ("Picture") for any Person other than Company, and no Person other than Company will be authorized to produce, distribute, exhibit or otherwise exploit in any and all media now or hereafter known any Picture unless you first:

(1)    furnish Company with complete copies of all of the instruments constituting the proposed agreement pursuant to which those Performances are to be rendered and the Picture concerned is to be produced and exploited (the "Outside Proposal"), and

(2)    offer to enter into an agreement with Company ("Company Agreement") on the same terms and in the same form as the Outside Proposal, except that: (i) the Picture and all contributions to its authorship made by you will be subject to all of the provisions of paragraphs 7.01 and 8.01 above which apply to Master Recordings and Phonograph Records, and will constitute "Materials" under subparagraph 13.01(d) above; and (ii) the Company Agreement will contain provisions in the form of paragraphs 17.01, 19.02, 19.04, 19.05, 19.06, 19.07, and 19.08 below.

(b)    If Company does not accept your offer within thirty (30) days after its receipt ("Offer Period"), you may then enter into the agreement set forth in the Outside Proposal, provided that agreement is consummated within sixty (60) days after the end of the Offer Period upon the same terms (or terms more favorable to you) and in the same form set forth in the Outside Proposal. If that agreement is not so consummated within that sixty (60) day period the right of preemption granted to Company in this paragraph will be revived and you will not render any musical Performances for the purpose of making any Picture for any Person except Company, and no Person other than Company will be authorized to produce or exploit any Picture, unless you first notify Company and offer to enter into an agreement with Company as provided in subparagraph 13.04(a) above.

145418AG.N03:

36

Exhibit 2
105

(c)    Company will not be required, as a condition of accepting any offer made to it pursuant to this paragraph 13.04, to agree to any terms or conditions which cannot be fulfilled by Company as readily as by any other Person (for example, but without limitation, the engagement of a particular director) or to waive any of its rights under this agreement.

(d)    You shall not authorize or knowingly permit the distribution of Audiovisual Records embodying any musical Performance by you which is rendered during the term hereof without the prior written consent of Company.

13.05.    (Intentionally deleted.)

13.06.    Your services are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Company shall be entitled to injunctive relief to enforce the provisions of this agreement.

13.07.    You will at all times indemnify and hold harmless Company and any of its Licensees (collectively the "Indemnitee") from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach or alleged breach of any warranty or representation made by you in this agreement or any other act or omission by you. Pending the resolution of any such claim, Company will have the right to withhold monies which would otherwise be payable to you under this agreement in an amount not exceeding your potential liability to Company under this paragraph.

## 14.    DEFINITIONS

14.01.    "Master Recording" and "Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

14.02.    "Inception of Recording" - the first recording of Performances or other sounds with a view to the eventual fixation of a Master Recording. "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this agreement.

14.03.    "Performance" (whether audio only or audiovisual) - means singing, speaking, conducting or playing an instrument, alone or with others.

145418AG.N03                                    37

Exhibit 2
106

14.04.    "Person" - any natural person, legal entity, or other organized group of persons or entities, or legal successors or representatives of the foregoing. (All pronouns, whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

14.05.    (a)    "Records" and "Phonograph Records" - all forms of reproductions (including, sound alone and audiovisual reproductions), now or hereafter known, manufactured or distributed primarily for home use, institutional use (e.g., library or school), juke box use, or use in means of transportation (including, without limitation, video games and any software media or transmission of such reproductions via telephone, cable, satellite or other transmissions to consumers directly into the home [e.g., CD-ROM, CD-1 and similar disc systems, interactive cable and/or telephony]).

(b)    "Audiovisual Record" - a Phonograph Record including sound accompanied by visual images intended primarily for home consumer or institutional (e.g., library or school) use, jukebox use or use in means of transportation, including, without limitation, videocassettes, laser discs, videodiscs or other media or devices now or hereafter known that, among other things, allow consumers to control the viewing of, or to interact with, the Audiovisual Record, including, without limitation, transmissions to consumers directly into the home that enable consumers to view such Records at any time. Audiovisual Records are not Albums, Singles, Twelve-inch Singles, or Extended Play Records.

14.06.    "Royalty Base Price" - The Royalty Base Price for Records (other than Audiovisual Records) shall be the Suggested Retail List Price applicable to the Phonograph Records concerned, less all excise, purchase, value added or similar taxes included in the price and less the applicable Container Charge. The Royalty Base Price for Records (other than Audiovisual Records) sold through any so-called "record club" will be the same as that for the identical Records sold Through Normal Retail Channels in the territory concerned. The Royalty Base Price for Audiovisual Records manufactured and distributed by Company or its Licensees shall be Company's or its Licensee's published wholesale price as of the commencement of the accounting period concerned, less all excise, purchase value added or similar taxes included in the price and less the applicable Container Charge.

14.07.    "Container Charges" - the applicable percentage, specified below, of the Suggested Retail List Price applicable to the Records concerned:

(a)    Vinyl Records - fifteen percent (15%).

(b)    Audiovisual Records and Records in analog tape form - twenty percent (20%).

Exhibit 2
107

(c)    Compact disc Records/New Medium Records - twenty-five percent (25%).

Container Charges will not be deducted for Singles packaged only in stock paper sleeves.

14.08.    "Net Sales" - with respect to Albums and Extended-Play Records, eighty-five percent (85%) of gross sales, and with respect to all Singles, seventy-seven percent (77%) of gross sales, less returns, credits and reserves against anticipated returns and credits; provided, that solely for purposes of computing Mechanical Royalties payable in respect of Albums (but not Singles or Extended-Play Records) hereunder, "Net Sales" will equal ninety-two and one-half percent (92.5%) of Gross Sales. Returns will be apportioned between Records sold and "free goods" in the same ratio in which Company's customer's account is credited.

14.09.    "Suggested Retail List Price" or "SRLP":

(a)    With respect to Records sold for distribution in the United States (other than Audiovisual Records), the suggested retail list price in the United States established by Company or its Licensees during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price shall be made for each price-series and configuration of Records manufactured and sold by Company or its Licensees; and

(b)    With respect to Records sold for distribution outside the United States (other than Audiovisual Records), Company's or its Licensees' suggested or applicable retail price in the country of manufacture or sale, as Company or its Licensee is paid; provided, however, that in any country where there is an absence of such suggested or applicable retail price, the price as may be established by Company or its Licensees in conformity with the general practice of the recording industry in such country, provided that Company or its Licensees may, but shall not be obligated to, utilize the price adopted by the local mechanical copyright collection agency for the collection of Mechanical Royalties.

(c)    Company or its Licensees may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Suggested Retail List Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the Record concerned would be the same as that which was payable immediately prior to such New Basis. If a Record was not theretofore sold in a particular configuration or in a particular price-series (e.g., a Budget Record), the adjusted royalty rate for any such

Exhibit 2
108

configuration shall be the adjusted royalty rate on Top-line Records multiplied by a fraction, the numerator of which is the royalty rate for sales in the configuration (or price-series) concerned prior to the New Basis and the denominator of which is the royalty rate for sales of Top-line Records in the applicable configuration prior to the New Basis. If there are other adjustments made by Company or its Licensees that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(d)    Royalties will be calculated separately with respect to each price series in which units of a particular Record release are sold or returned during the semi-annual accounting period concerned. References to published prices in this section refer to those in effect at the commencement of the accounting period concerned.

14.10.    "Contract Period" and "Period" - the initial period, or any Option Period, of the term hereof (as such Periods may be suspended or extended as provided herein).

14.11.    "Advance" - a prepayment of royalties. Company may recoup Advances from royalties to be paid to or on your behalf pursuant to this or any other agreement, and from Mechanical Royalties payable for the use of Controlled Compositions on Phonograph Records distributed by Company, solely as specifically provided for herein. "Any other agreement," in this paragraph, means any other agreement with Company relating to you as a recording artist, subject to the provisions of paragraph 5.02(d) hereof.

14.12.    "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley. Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one (1) Composition for all purposes under this agreement.

14.13.    "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, a Producer (except any Producer engaged by Company pursuant to subparagraph 2.02(b)), or any Person in which you, or a Producer (except any Producer engaged by Company pursuant to subparagraph 2.20(b)) has a direct or indirect interest.

14.14.    (a)    "Album" - one (1) or more twelve-inch (12"), 33 1/3 rpm vinyl-disc Records, or the equivalent in a non vinyl-disc configuration, at least thirty-three (33) minutes in playing time, sold in a single package and, unless Company

145418AG.NO3

40

Exhibit 2
109

agrees otherwise in writing, containing at least nine (9) but not more than eleven (11) different Compositions.

(b) "Single" - a vinyl-disc Record not more than seven (7") inches in diameter, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than two (2) Compositions.

(c) "Twelve-Inch Single" - a twelve-inch (12") vinyl-disc Record, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than three (3) Compositions and does not constitute an Album.

(d) "Extended Play Record" - a Record which contains Recordings of four (4) or more Compositions but does not constitute an Album.

14.15.    "Side" - a Master Recording of a continuous Performance of a particular arrangement or version of a Composition, not less than two and one-quarter (2-1/4) minutes in playing time. If any Album (or other group of Master Recordings) Delivered to Company in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more than one (1) arrangement or version of any Composition, all of those Recordings will be deemed to constitute one (1) Side.

14.16.    "Joint Recording" - any Master Recording embodying your Performance and any Performance by another artist with respect to which Company is obligated to pay royalties.

14.17.    "Sales Through Normal Retail Channels" - sales other than as described in paragraphs 9.02, 9.03(a), 9.04, 9.05, 9.06, 10.03 and 10.04.

14.18.    (a)    "Licensees" - all Persons (whether or not affiliated with Company or Company's Distributor) to which Company has licensed the right of sale, distribution or exploitation of Master Recordings and/or Records made hereunder, including, without limitation, wholly or partly owned subsidiaries, affiliates, and other divisions of Company or its Distributor.

(b)    "Distributor" - the record company having the exclusive right at any time to distribute Company's newly released Records through USNRC.

14.19.    "Delivery", when used with respect to Master Recordings means the actual receipt and acceptance by Company of the Master Recordings concerned and all documents and other materials required to be furnished to Company in connection with them. Without limiting the generality of the preceding sentence, no Master Recordings will be deemed Delivered and accepted until Company has received all of the related documentation required under subparagraphs 4.01(c), 4.01(e) and

Exhibit 2
110

4.01(g) and all other materials referred to in subparagraph 4.01(f). Company will have the right to disapprove and reject any Master Recording which in Company's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, or infringes or violates the rights of any Person, or which might subject Company to liability or unfavorable regulatory action.

14.20.    "Top-line Record" - a Record released bearing the same Suggested Retail List Price as the majority (or plurality) of the Record releases in the same configuration then in initial release in Company's active catalog. (For the purposes of the preceding sentence, a Record release will not be deemed in its initial release if it bears a Suggested Retail List Price lower than that which applied to it when it was first released by Company.)

14.21.    (a)    "Budget Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price which is sixty-seven percent (67%) or less of the Suggested Retail List Price in the country concerned applicable to the Top-line Records in the same configuration (e.g., long-playing Album, two-disc long-playing Album, Twelve-Inch Single, analog tape cassette, compact disc, etc.) released by Company or its Licensees in the territory concerned.

(b)    "Mid-price Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price in the country concerned in excess of sixty-seven percent (67%) and less than eighty-five percent (85%) of the Suggested Retail List Price applicable to the Top-line Record in the same configuration.

14.22.    "Multiple Record Set" - an Album which contains two (2) or more twelve-inch (12"), 33 1/3 rpm vinyl-disc Records packaged as a single unit, or the equivalent in playing time in other non vinyl-disc configurations, or which, because of the number of Master Recordings embodied thereon or the playing time thereof, bears a Suggested Retail List Price which is greater than that of the majority of Company's then-current releases in that particular configuration. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record Set accepted by Company shall be deemed only one (1) Album.

14.23.    "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted Compositions on Phonograph Records other than Audiovisual Records.

14.24.    "Recording Costs" - all amounts representing direct expenses paid or incurred by Company in connection with the production of finished Master Recordings under this agreement. Recording Costs include, without limitation, the amounts referred to in paragraph 5.01, travel, rehearsal, and equipment rental and cartage expenses, advances to Producers, transportation costs, hotel and living expenses approved by Company, studio and engineering charges in connection with

145418AG.NO3

42

Exhibit 2
111

Company's facilities and personnel or otherwise, all costs and expenses of obtaining rights to all samples of Master Recordings, selections and other materials embodied in Master Recordings hereunder (including, without limitation, all advances, license fees, attorneys' fees and clearing house fees), all costs of mastering, remastering, remixing and/or "sweetening" and all costs of lacquer, copper, and other equivalent masters.

14.25.    "Special Packaging Costs" - costs incurred by Company in creating and producing Album covers, sleeves, and other packaging elements, in excess of Company's then-standard costs for design of artwork (including expenses for reproduction rights), engraving, separations and then-standard packaging manufacturing costs.

14.26.    (a)    "New Medium" Records - Records (other than Audiovisual Records) in any software medium (including, without limitation, "digital audio tape", "digital compact cassette" and "Mini-Disc" and transmission directly into the home) in which recorded music is not in general commercial distribution in the United States as of January 1, 1993.

(b)    "Standard" Records, units, etc. - Records other than New Medium Records and Audiovisual Records.

14.27.    "Covered Video" - an audiovisual work owned or controlled by Company, the soundtrack of which consists primarily of one (1) or more Master Recordings subject to this agreement.

## 15.    REMEDIES

15.01. If you do not fulfill any portion of your Recording Commitment within the time prescribed in Article 3, Company will have the following options:

(a)    to suspend Company's obligations to make payments to you under this agreement until you have cured the default;

(b)    to terminate the term of this agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c) to require you to repay to Company the amount, not then recouped, of any Advance previously paid to you by Company and not specifically attributable under Article 6 to any Commitment Album which has actually been fully Delivered.    Company may exercise each of those options by sending you the appropriate notice.  Company will not exercise its rights under subparagraph 15.01(a) if the default concerned is attributable entirely to your death or disability.  If Company terminates the term under subparagraph 15.01(b), all parties will be deemed to have

145418AG:N03

43

Exhibit 2
112

fulfilled all of their obligations under this agreement except those obligations which survive the end of the term (e.g., indemnification obligations, royalty accounting and payment obligations, re-recording restrictions and your obligations under subparagraph 15.01(c)). No exercise of an option under this paragraph will limit Company's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02.     If Company refuses without cause to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place, you notify Company of your desire to fulfill such Recording Commitment, then Company shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days after Company's receipt of your notice. Should Company fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to Company within thirty (30) days after the expiration of the latter sixty-day period; on receipt by Company of such notice, the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties [subject to Company's suspension rights]), at which time Company shall pay to you, in full settlement of its obligations to you (other than those royalty obligations) an Advance in the amount equal to your minimum union scale compensation for the unfulfilled portion of the Recording Commitment for that Contract Period. If you fail to give Company either notice within the period specified therefor, Company shall be under no obligation to you for failing to permit you to fulfill such Recording Commitment.

15.03.     If because of: act of God; inevitable accident; fire; lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or Producer; or other cause of a similar or different nature not reasonably within Company's control; Company is materially hampered in the recording, manufacture, distribution or sale of Records, then, without limiting Company's rights, Company shall have the option by giving you notice to suspend the running of the then-current Contract Period for the duration of any such contingency plus such additional time as is necessary so that Company shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, to extend the term of this agreement for the next following Option Period.

Exhibit 2
113

16. **AGREEMENTS, APPROVAL & CONSENT**

16.01. As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld (except as otherwise expressly provided in this agreement).

16.02. Except as otherwise expressly provided in this agreement, your agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify Company otherwise within five (5) business days following the date of Company's written request to you therefor.

17. **NOTICES**

17.01. Except as otherwise specifically provided in this agreement, all notices under this agreement shall be in writing and shall be given by courier or other personal delivery or by registered or certified mail at the appropriate address below or at a substitute address designated by notice by the party concerned:

TO YOU:   FISHBACH, PEARLSTEIN LIEBERMAN & YANNY
1925 Century Park East, Ste. 1260
Los Angeles, California 90067
Attention:  Robert H. Lieberman, Esq.

TO COMPANY:   DELICIOUS VINYL, L.L.C.
6607 Sunset Boulevard
Los Angeles, California 90028
Attention: President

With a copy to:   KING, PURTICH, HOLMES, PATERNO & BERLINER
1900 Avenue of the Stars, 25th Floor
Los Angeles, California 90067
Attention: Peter T. Paterno, Esq.

Notices shall be deemed given when mailed, except that a notice of change of address shall be effective only from the date of its receipt.  All royalties, royalty statements and/or payments to you hereunder may also be sent to you at your address above via regular mail and shall be deemed sent on the date the applicable statement is mailed.

18.   (Intentionally omitted.)

145418AG.N03                           45

Exhibit 2
114

## 19.   MISCELLANEOUS

19.01.    You will, during the term of this agreement, actively pursue a career as an entertainer in the live engagement field.

19.02.    Company will have the right, throughout the term of this agreement, to obtain or increase insurance on your life, at Company's sole cost and expense, in such amounts as Company determines, in Company's name and for its sole benefit or otherwise, in its discretion.  You will cooperate in such physical examinations without expense to you, supply such information, sign such documents, and otherwise cooperate fully with Company, as Company may request in connection with any such insurance.  You warrant and represent that, to your best knowledge, you are in good health and does not suffer from any medical condition which might interfere with the timely performance of your obligations under this agreement.

19.03.    (a)    This agreement contains the entire understanding of the parties relating to its subject matter and supersedes all prior or contemporaneous written or oral agreements, representations, understandings and/or discussions between the parties relating thereto.  No change or termination of this agreement will be binding upon Company unless it is made by an instrument signed by an officer of Company.  A waiver by either party of any provision of this agreement in any instance shall not be deemed to waive it for the future.  All remedies, rights, undertakings, and obligations contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking or obligation of either party.  The captions of the Articles in this agreement are included for convenience only and will not affect the interpretation of any provision.

(b)    No change of a budget prescribed in this agreement or established under it will be effective unless the change is approved in writing by Company.

19.04.    Those provisions of any applicable collective bargaining agreement between Company and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.

19.05.    Company may assign its rights under this agreement in whole or in part.  You may assign this agreement only to a corporation wholly owned and controlled by the Artist, but no such assignment shall relieve you or the Artist from any of your or the Artist's obligations hereunder.

19.06.    Each option and election granted to Company in this agreement including, without limitation, to suspend the running of one or more periods of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise

145418AG.N03

46

Exhibit 2
115

of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by Company in its notice of exercise of such option or election.

19.07.    You will not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by Company of its material obligations, unless Company has failed to remedy the breach within sixty (60) days following receipt of your notice thereof.

19.08.    THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA.  THE CALIFORNIA COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN LOS ANGELES COUNTY, AND NOT ELSEWHERE.  ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN ARTICLE 17 OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO ARTICLE 17.  ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE COMPANY TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN ARTICLE 17 OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER PRESCRIBED IN ARTICLE 17.  ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

19.09.    In entering into this agreement, and in providing services pursuant hereto, you have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you as Company's agents or employees.

19.10.    Monies to be paid to you under this agreement will not be assignable by you without Company's written consent, which Company may withhold in its unrestricted discretion.

19.11.    You recognize that the sale of Records is speculative and agree that the judgment of Company with respect to matters affecting the sale, distribution and exploitation of Records hereunder shall be binding upon you.  Subject to the terms of this agreement, nothing contained in this agreement shall obligate Company to

145418AG.N03

**47**

Exhibit 2
116

make, sell, license or distribute Records manufactured from the Master Recordings recorded hereunder except as specified in this agreement.

19.12.    This agreement shall not become effective until executed by all proposed parties hereto.

19.13.    Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and Company.

19.14    During the eighteen (18) months following Delivery of a Commitment Album, Company shall have an agreement for the retail distribution of such Commitment Album with a major label distributor, as such term is commonly understood in the industry.  If during such time period Company's distribution agreement shall terminate, you shall give Company written notice of same and Company shall have 30 days from the date of Company's receipt of your notice to secure a new distribution agreement.  If we are unable to secure a new distribution agreement within such 30 day period, you shall have the right to terminate the agreement.

19.15    Pharcyde shall receive sole executive producer credit on Albums delivered hereunder.

20.    **GROUP PROVISIONS**

20.01.    (a)    As used herein, the term "Artist" includes all members of the group presently professionally known as "The Pharcyde" whether currently or hereafter bound by the terms and provisions of this agreement.  The obligations, liabilities, prohibitions and restrictions imposed upon you hereunder shall be deemed to apply individually and collectively to each of the members of the Artist, whether performing alone, with others, or as a member of the Artist, regardless of the name by which the Artist or any of its members may then be identified.  A failure by any member of the Artist to satisfy the obligations of the Artist shall, at Company's election, be deemed a breach of this agreement.  In the event of any such breach, Company may, by notice to you, and without limiting Company's other rights or remedies hereunder, terminate the term of this agreement, or alternatively, may terminate the term of this agreement only as to the member or members of the Artist who have failed to satisfy your obligations hereunder.

(b)    Notwithstanding any change in the membership of the group, Company will continue to have the right to remit all payments under this agreement in the name of "The Pharcyde".

Exhibit 2
117

20.02.    (a)    (1)    As used herein, a "Leaving Member" means (i) any member of Artist who, during the term hereof, ceases to be an actively performing member of Artist for any reason whatsoever (except by reason of such member's entering into a Third Party Solo Agreement in accordance with paragraph 7.04 above) including, without limitation, as a result of the death or physical or mental disability of such member, and (ii) if you disband or Company decides to terminate this agreement because of there being a Leaving Member, each member of Artist. If there shall be a Leaving Member, you will notify Company promptly and, in such event, or if Company terminates the term of this agreement with respect to fewer than all members of you as set forth herein, then, if you and Company so agree, the Leaving Member will be replaced by a new member, which replacement member shall be mutually approved by you and Company. Each such replacement member, as well as any additional new member of the Artist, will be deemed a party to this agreement, and you will cause each new member (whether additional or replacement member) to execute and deliver to Company any and all documents as Company, in its reasonable judgment, may require to accomplish that addition or substitution. Thereafter, the Leaving Member will not render services for Performances under this agreement, but the Leaving Member will continue to be bound by the other provisions of this agreement, including, without limitation, subparagraphs 20.02(b) and (c) below. You will not permit any Person to perform in place of the Leaving Member, or any additional new member to perform, in making Recordings under this agreement, unless that Person has executed and delivered to Company the documents referred to in this section. Company will continue to have the right to use the name "The Pharcyde" and any other professional, group, and other assumed or fictitious names used by you at any time, in connection with Recordings of the your Performances made at any time; no Leaving Member will make any use of the name "The Pharcyde" or any such other name in any circumstances.

(2)    Company will have the right to terminate the term of this agreement with respect to the remaining members of Artist by notice given to you at any time before the expiration of ninety (90) days after Company's receipt of your notice.  In the event of such termination, all of the members of the Artist will be deemed Leaving Members as of the date of such termination notice, and subparagraph 20.02(c) will apply to all or any of them, collectively or individually as Company elects.

(b)    Each Advance becoming payable under this agreement after the Leaving Member ceases to perform as a member of the group will be reduced in that proportion which the number of Leaving Members bears to the size of the group as constituted before their departure (for example, to eighty percent [80%] of the amount prescribed in paragraph 6.02 if there are five (5) members and one (1) of them leaves), whether or not any Leaving Member is replaced by another performer.  The royalty percentage rates applicable under paragraph 9.01 to Records derived from

145418AG.N03                                    49

Exhibit 2
118

Master Recordings made under this agreement after the Leaving Member ceases to perform as a member of the group will also be reduced in the same proportion.

(c)    You grant to Company an option to engage the exclusive services of each Leaving Member as a recording artist ("Leaving Member Option"). Each Leaving Member Option may be exercised by Company by notice to the Leaving Member at any time before the expiration of sixty (60) days after the date of: (1) Company's receipt of your notice under section 20.02(a)(1), or (2) Company's termination notice pursuant to section 20.02(a)(2), as the case may be. If Company exercises a Leaving Member Option, the Leaving Member concerned will be deemed to have entered into a new agreement ("LM Agreement") with Company containing the same provisions as this agreement, except as follows:

(1)    The LM Agreement will apply only to that Leaving Member, and all references to "you" will be deemed to refer to the Leaving Member;

(2)    The term of the LM Agreement will commence on the date of Company's exercise of such Leaving Member Option and may be extended by Company, at its election exercisable in the manner provided in paragraph 1.02 of this agreement, for the same number of additional Periods as the number of Option Periods, if any, remaining pursuant to paragraph 1.02 at the time of Company's exercise of the Leaving Member Option (but at least four (4) such additional Periods in any event);

(3)    The Recording Commitment for the first Contract Period of the term of the LM Agreement will be two (2) Sides, with an option for additional Master Recordings sufficient to constitute the balance of an Album. The Recording Commitment for each Option Period of the LM Agreement will be Master Recordings sufficient to constitute one (1) Album;

(4)    Paragraph 6.02 and the second sentence of section 4.01 (a)(4) will not apply; instead, Recordings will be made on an approved budget basis;

(5)    The royalty percentage rates in respect of Master Recordings made during that term will be sixty-six and two-thirds percent (66-⅔%) of the royalty percentage rates prescribed in paragraph 9.01; and

(6)    If your royalty account under this agreement is in an unrecouped position at the date of Company's exercise of the Leaving Member Option, the unrecouped balance in your royalty account under this agreement ("Unrecouped Group Advance"), will constitute an Advance recoupable from the royalties payable under the LM Agreement; provided, that Company shall nevertheless have the right to recoup the entire Unrecouped Group Advance from royalties payable under this

145418AG.N03                          50

Exhibit 2
119

agreement; provided, further, that the Unrecouped Group Advance shall at all times be deemed to be the last monies recouped from royalties payable under the LM Agreement. If Company recoups any of the Unrecouped Group Advance from royalties payable with respect to the applicable Leaving Member's Recordings and thereafter recoups all or any portion thereof from royalties payable with respect to Recordings embodying your Performances hereunder, then Company shall thereupon re-credit the royalty account under the LM Agreement with respect to such portion of royalties. Moreover, solely with respect to Master Recordings recorded by you hereunder prior to the commencement of the term of the LM Agreement, Company shall have the right to apply the "Prorated Royalty" (as defined below) earned by you hereunder to the recoupment of any unrecouped balances in your account under the LM Agreement. As used herein, the term "Prorated Royalty" means the royalty payable to you hereunder with respect to the Master Recordings in question multiplied by a fraction, the numerator of which is the number of Leaving Members subject to the LM Agreement and the denominator of which is the total number of members of Artist (including all Leaving Members) who participate in such royalty.

          (7)     If there shall be more than one (1) Leaving Member for whom Company has exercised its option as provided in this subparagraph and two (2) or more of such Leaving Members shall, with Company's consent, elect to perform together as a duo or group, then Company shall have the right to treat such Leaving

Exhibit 2
120

Members collectively as if they were only one (1) Leaving Member for the purpose of the royalty rates, advances and other monies payable in respect of their joint recordings pursuant to this subparagraph.

ACCEPTED AND AGREED:                    DELICIOUS VINYL, INC.

Romye Robinson
Social Security # 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            By:
                                             Authorized Signatory

E. Imani Wilcox
Social Security # 560 25 5222

Trevant Hardson
Social Security # 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

145416AG.N03                            52

Exhibit 2
121

# SCHEDULE OF PUBLISHERS
## (Reference - Article 12)

Exhibit 2
122

# Exhibit "3"

Exhibit 3
123

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE OF CLAIMS

This Settlement Agreement and Mutual General Release of Claims ("Agreement") is entered into as of _____, 2004, by and between Romye Robinson and Imani Wilcox (hereafter "The PHARCYDE") on the one hand, and Trevant HARDSON (hereafter "HARDSON") on the other hand (together, the "PARTIES"), and is intended by the PARTIES hereto to settle fully and finally all claims and obligations that each may have or claim against the other.

## RECITALS

This Agreement is based on and entered into with reference to the following facts:

A.    HARDSON was an original member of The PHARCYDE;

B.    HARDSON voluntarily left The PHARCYDE, effective in or about August, 1999;

C.    The PHARCYDE has made allegations against HARDSON arising from the PARTIES' prior business relationship (the "Claims");

D.    HARDSON denies all liability; and

E.    The PARTIES wish to avoid the disruption, inconvenience, uncertainty, and costs associated with further processing or litigation of the Claims the PARTIES may have or claim to have had against each other, and desire to settle fully and finally all differences between them, including, but in no way limited to, any differences arising out of HARDSON's partnership in and dissociation from The PHARCYDE;

COME NOW the Parties herein with desire and intent by this Agreement to settle fully and finally all pending litigation between them and to provide for mutual releases as to all claims for full and valuable consideration, and based upon the foregoing recitals and the terms, covenants and conditions contained herein.

## AGREEMENT

1.    **Dissociation/Waiver of Rights.** HARDSON and the PHARCYDE agree to execute the Dissociation Agreement attached hereto as Exhibit "A," setting forth the terms of HARDSON's dissociation from the PHARCYDE effective on August 1, 1999 (the "Separation Date"). HARDSON specifically waives any right in and to the name, title, trademark and/or designation "The PHARCYDE." HARDSON further agrees that all sums to which he may be entitled from a third party that are made payable to The PHARCYDE, shall be paid in accordance with the terms of the Dissociation Agreement.

2.    **Authority to Settle Dispute.** The Parties each represent that they have full and actual authority to enter into this Agreement and to grant each of the releases contained herein.

-1-

Exhibit 3
124

3.     Consideration. The PARTIES agree that this Agreement is supported by full and adequate consideration based on the mutual covenants and promises set forth herein.

4.     No Other Payments. Except as provided herein, the PARTIES acknowledge that no other compensation or benefit of any nature whatsoever is due and owing by one to the other pursuant to the PARTIES' former partnership, or otherwise.

5.     Complete Release of Claims. In consideration for this Agreement each PARTY hereby releases and forever discharges the other PARTY and, as the case may be, each of its respective predecessors, successors, heirs, assigns, employees, members, shareholders, officers, directors, agents, attorneys, parent corporations, subsidiaries, divisions or affiliated corporations or organizations, and all persons acting by, through, under or in concert with them, or any of them, whether previously or hereafter affiliated in any manner (collectively "Released PARTIES"), from any and all claims, demands, causes of action, charges of discrimination, obligations, damages, attorneys' fees, costs and liabilities of any nature whatsoever, whether or not now known, suspected or claimed, which any Party ever had, now has, or may claim to have as of the date of this Agreement, against the Released PARTIES (whether directly or indirectly), or any of them, by reason of any act or omission concerning any matter, cause, or thing, including, without limiting the generality of the foregoing, any claims arising out of, based upon, or related to those claims made by the PHARCYDE against HARDSON as well as any counterclaims, matters, causes, or things whatsoever that were, have been, or in any way could have been alleged as of the date of this Agreement related to HARDSON's former association with and/or participation in the group The PHARCYDE whether or not now known, suspected or claimed, which EMPLOYEE ever had, now has, or may claim to have as of the date of this Agreement against the Released PARTIES, or any of them. **This release specifically includes the release of all claims by the PARTIES arising out of their former partnership in The PHARCYDE, including but not limited to Case No. BC307842 filed December 17, 2003 in the Superior Court of California for the County of Los Angeles. Upon execution, by HARDSON, of this Agreement along with the dissociation agreement attached hereto as Exhibit A, The PHARCYE shall file a Request for Dismissal of the above referenced case.**

6.     Confidentiality. As a material inducement to the PARTIES to enter into this Agreement, the PARTIES each agree that the terms of this Agreement shall be and remain confidential, and promise and covenant not to disclose, publicize or cause to be publicized, and that they will not in the future disclose, publicize or cause to be publicized, any of the terms and conditions of this Agreement except to the PARTIES' respective accountants, and attorneys on a need to know basis and who agree to abide by the confidentiality obligations stated herein. In the event any disclosure concerning this Agreement or the circumstances relating thereto may appear to be required by valid legal process, the Party who may be required to make such a disclosure shall seasonably notify all other PARTIES in writing in advance of the threatened disclosure and provide the PARTIES a reasonable opportunity to contest or oppose such disclosure. Failure, by either Party, to comply with the terms of this paragraph, which results in disclosure or publication of the terms of this Agreement to any individual other than such individuals authorized above to receive such disclosure or publication, shall constitute a breach of this Agreement.

-2-

Exhibit 3
125

7.    Injunctive Relief for Breach. The PARTIES acknowledge and agree that any material breach of this Agreement is likely to result in immediate and irreparable harm to the non-breaching Party, for which monetary damages are likely to be inadequate. Accordingly, the PARTIES consent to injunctive and other appropriate equitable relief upon the institution of proceedings therefor by the non-breaching Party in order to protect its rights. Such relief shall be in addition to any other relief to which the non-breaching Party may be entitled at law or in equity.

8.    Non-Admission of Liability. Neither anything contained herein, nor the consummation of this Agreement is to be construed or deemed an admission of liability, culpability, negligence, or wrongdoing on the part of either of the PARTIES, or any affiliated entity or individual, and each denies liability therefor. Each of the PARTIES hereto has entered into this Agreement with the intention to avoid further disputes and litigation with the attendant inconvenience and expense.

9.    Non-Assignment of Claims. The PARTIES warrant that they have made no assignment and will make no assignment of any claim, chose in action, right of action, or any right of any kind whatsoever, embodied in this Agreement and Claims embraced herein, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorneys' fees, costs, expenses, losses or claims referred to herein.

10.    Attorneys' Fees for Breach or Enforcement. If any legal action (including arbitration) is brought to enforce the terms of this Agreement or the dissociation agreement incorporated by reference herein and attached as Exhibit A, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the prevailing Party shall be entitled to recover its, or his reasonable attorneys' fees and costs incurred in such action, in addition to any other relief to which that Party may be entitled.

11.    Interpretation. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid and effective under applicable law. Should any portion, word, clause, phrase, sentence or paragraph of this Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected. Whenever required by the context, as used in this Agreement the singular number shall include the plural, and the masculine gender shall include the feminine and neuter. All captions are for convenience of reference only and shall be disregarded in interpreting this Agreement.

12.    Entire Agreement. This Agreement and the attached Dissociation Agreement referenced herein constitute the entire agreement between the PARTIES who have executed them and supersede any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between the PARTIES to this Agreement. The PARTIES hereto acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in this Agreement, that they have not executed this Agreement in reliance on any such representations, inducements, promise, agreement or warranty, and that no representation,

-3-

Exhibit 3
126

inducement, promise, agreement or warranty not contained in this Agreement, including, but not limited to, any purported supplements, modifications, waivers or terminations of this Agreement shall be valid or binding, unless executed in writing by all of the PARTIES to this Agreement.

13.    Governing Law. This Agreement shall in all respects be interpreted, enforced and governed under the laws of the State of California without giving effect to conflicts of laws principles.

14.    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

15.    No Waiver. Failure to insist on compliance with any term, covenant or condition contained in this Agreement shall not be deemed a waiver of that term, covenant or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

16.    Knowing and Voluntary Agreement. The PARTIES specifically represent that they have carefully read and fully understand all of the provisions of this Agreement, and that each Party is voluntarily and knowingly entering into this Agreement. The PARTIES also specifically represent that prior to signing this Agreement, they have been provided a reasonable period of time within which to consider whether to accept this Agreement. The PARTIES have been advised that this is an important legal document and that each should consult with an attorney of his or its choosing prior to entering into this Agreement. The PARTIES specifically represent that each has been given an opportunity to consult with counsel and that, to the extent desired, each has consulted with an attorney of his or its choosing regarding the terms and conditions of this Agreement.

17.    Binding on Successors. This Agreement, and all the terms and provisions hereof, shall be binding upon and shall inure to the benefit of the PARTIES and their respective heirs, legal representatives, successors and assigns.

18.    Waiver of Civil Code, Section 1542. The Parties each acknowledge that they are aware that they or their attorneys may hereafter discover facts different from or in addition to the facts which they now know or believe to be true with respect to the subject matter of this Agreement. Nonetheless, it is their intention hereby fully, finally, absolutely and forever to settle and release any and all matters described in the preceding paragraphs hereof which exist, may exist or may heretofore have existed between them and, in furtherance of such intention, the releases herein given shall be and remain in effect notwithstanding the discovery of any additional or different facts relating to the subject matter of this Agreement. Therefore, the Parties each acknowledge that they have had the opportunity and ability to consult with and be informed by attorneys of their choosing regarding all aspects of this Agreement and that they are familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT

-4-

Exhibit 3
127

THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The Parties each hereby knowingly and voluntarily waive and relinquish all rights and benefits they have or may have under Section 1542 of the Civil Code of the State of California, or any like statute or law in any other jurisdiction to the full extent they may lawfully do so with respect to the subject matter of this Agreement.

19.    Waiver of Code of Civil Procedure, Section 1654. The PARTIES acknowledge that they and their attorneys have participated (or at the Party's sole discretion, have waived its or his respective attorney's participation) in the preparation, negotiations and drafting of this Agreement. This Agreement, and any ambiguities or uncertainties contained herein, shall be equally and fairly interpreted for the benefit of and against all PARTIES hereto, and construed without reference to the identity of the PARTIES preparing this Agreement, on the express understanding and agreement that the PARTIES participated equally in the negotiations and preparation of this Agreement, and have had equal opportunity to do so. Accordingly, the PARTIES hereby waive the benefit of California Code of Civil Procedure, Section 1654 and any successor or amended statute, providing that in cases of uncertainty, language of a contract should be interpreted most strongly against the Party who caused the uncertainty to exist.

IN WITNESS WHEREOF, the undersigned have executed this Settlement Agreement and General Release of Claims, and have initialed each page hereof, on the dates set forth hereinafter.

CAUTION! READ BEFORE SIGNING.

Acceptance by The PHARCYDE:

-5-

Exhibit 3
128

## Exhibit A

### DISSOCIATION AGREEMENT

This Dissociation Agreement (hereafter "Agreement") is entered into as of this day of February, 2004, by and between Romye Robinson and Imani Wilcox (hereafter "Partners") on the one hand, and Trevant Hardson (hereafter "HARDSON") on the other hand (together the "Parties"), and is intended by the Parties hereto to formalize and memorialize the terms and conditions of Hardson's voluntary dissociation from the musical recording group p/k/a "THE PHARCYDE" (hereafter "Pharcyde")

WHEREAS, Trevant Hardson aka Tre (hereafter "Hardson") along with Romye Robinson, Derrick Stewart, and Imani Wilcox founded the Pharcyde in or about June, 1990; and

WHEREAS, the association of the members of Pharcyde to carry on as co-owners of a business for profit formed a recognizable partnership under the laws of the state of California; and

WHEREAS, Hardson dissociated himself from Pharcyde on or about August 1, 1999 ("Termination Date") in order to pursue a solo career in the music industry and Robinson and Wilcox (collectively the "Partners") are the sole remaining partners in Pharcyde and have exclusive use of the name Pharcyde and all derivatives thereof;

NOW THEREFORE, for full and valuable consideration, and based upon the foregoing recitals and the terms, covenants and conditions contained herein, the Parties agree as follows:

1.　　Termination.  The termination of Hardson's partnership in, to, and with Pharcyde as of the Termination Date is hereby formalized and memorialized subject to the terms and conditions herein.

2.　　Relief of Debt.  The Parties hereby agree to forgive one another of any debt or liabilities, monetary or otherwise, which are alleged to have become due or owing prior to the date of execution of this Agreement. Notwithstanding the forgoing, the Parties shall be entitled to all sums which become payable subsequent to the execution of this Agreement pursuant to paragraph 3 hereof.

3.　　Future Compensation.  Hardson shall receive the following compensation with respect to services heretofore rendered by Hardson as a member of Pharcyde:

　　　　a.　With respect to sales of Pharcyde recordings embodying Hardson's performances (hereafter "Hardson Masters") or other exploitation of Hardson Masters entitling Pharcyde to any royalty, payment or compensation, Hardson

Exhibit 3
129

I understand and agree that I: (a) have carefully read and fully understand all of the provisions of this Agreement; (b) am, through this Agreement, releasing the COMPANY (and other Released PARTIES) from any and all claims I may have against the COMPANY (and other Released PARTIES) except as discussed in paragraph 8; and (c) knowingly and voluntarily agree to all of the terms set forth in this Agreement and intend to be legally bound by the same; was advised and hereby am further advised in writing to consider the terms of this Agreement and to consult with an attorney of my choice prior to executing it; I hereby agree to be bound by all the terms and conditions and I signify my agreement by my signature.

The PHARCYDE

By: _____
Romye Robinson

By: _____
Imani Wilcox

Dated: _____, 2003

Acceptance by HARDSON:

I understand and agree that I: (a) have carefully read and fully understand all of the provisions of this Agreement; (b) am, through this Agreement, releasing the COMPANY (and other Released PARTIES) from any and all claims I may have against the COMPANY (and other Released PARTIES) except as discussed in paragraph 8; and (c) knowingly and voluntarily agree to all of the terms set forth in this Agreement and intend to be legally bound by the same; was advised and hereby am further advised in writing to consider the terms of this Agreement and to consult with an attorney of my choice prior to executing it; I hereby agree to be bound by all the terms and conditions and I signify my agreement by my signature.

TREVANT HARDSON

By: _____
Trevant HARDSON

Dated: _____, 2003

-6-

Exhibit 3
130

shall receive a portion of the applicable royalty, advance or other compensation payable to Pharcyde (hereafter "Royalty"). Hardson's compensation shall be calculated by multiplying the Royalty by a fraction the numerator of which is one (1) and the denominator of which is the total number of Artists whose performances are embodied on the Hardson Masters.

b. With respect to Royalties due in connection the exploitation of Pharcyde recordings or video performances in any configuration now or hereafter known (hereafter "Pharcyde Projects"), which contain Hardson Masters as well as other master recordings, Hardson shall be paid the royalty applicable in subparagraph (a) hereof multiplied by a fraction the numerator of which is the number of Hardson Masters on the project and the denominator of which is the total number of royalty bearing masters, including Hardson Masters, embodied on the project.

4.  Assignment.

a. Effective as of the Termination Date, Hardson hereby assigns all of his rights, title and interest in and to all assets, both tangible and intangible, of Pharcyde, including without limitation, all agreements to which Pharcyde is a party and all master recordings (audio and/or visual), in any medium, embodying the performance of Pharcyde or any member thereof, recorded on or before the execution of this Agreement, together with all of the proceeds therefrom, subject only to the compensation provided in paragraph 3 above. Further, Hardson shall have no rights, claims or interests whatsoever in and to any future assets to which Pharcyde may now or hereafter become entitled to in connection with exploitation of Pharcyde Projects, as defined herein, together with any proceeds therefrom except as outlined in paragraph 3.

b. Effective immediately, Hardson shall not avail himself of or use the name, trademark and/or designation "The Pharcyde", "Pharcyde", "Edy Crahp" or any derivative or substantially similar designation, in any medium or commercial manner whatsoever except that Hardson shall be granted the right hereby to make public reference to himself as "formerly of the Pharcyde" without breaching this Agreement. Hardson acknowledges and agrees that as between Hardson and Partners, Partner are and shall continue to be the sole and exclusive owner of all right, title and interest in and to the name, trademark and/or designation "Pharcyde" or "The Pharcyde" and shall have the continuing, unrestricted, and exclusive right to use the name, trademark and/or designation "Pharcyde" or "The Pharcyde" in any medium or commercial manner whatsoever. Notwithstanding the foregoing, Pharcyde shall have the the perpetual and unrestricted right to use Hardson's name and likeness and biographical information currently in use or substantially similar thereto on or in connection with the exploitation of Pharcyde Projects.

Exhibit 3
131

c.  Hardson hereby represents and warrants that all assets, properties and rights assigned to Partners herein are free and clear from all liens, encumbrances and/or claims of and by any third parties of any kind (other than those imposed pursuant to any agreement by which Partners are authorized parties and of which Partners are aware). Hardson shall indemnify Partners against any and all expenses, loss or cost (including attorney's fees and costs) incurred by Partners by reason of any breach of this Agreement by Hardson.

d.  Partners hereby represent and warrant that Partners have not received any royalty or other compensation from Delicious Vinyl with respect to any Hardson Masters or Pharcyde Project containing Hardson Masters within five (5) years of the date hereof.

5.  <u>Other Instruments</u>.  Partners and Hardson shall sign such other documents, including any assignments or transfers, that Artist may reasonably require and deed necessary or desirable to effectuate the terms of this Agreement.

6.  <u>Arbitration</u>.  Any and all disputes arising under this Agreement or relating to the terms hereof shall be submitted to arbitration in Los Angeles, California in accordance with the rules of the American Arbitration Association. Each party shall nominate one arbitrator, and the two arbitrators so appointed shall appoint a third arbitrator. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. In the event of litigation or arbitration, the prevailing party shall be entitled to recover any and all reasonable attorney's fees and other costs incurred in the enforcement of the terms of this Agreement.

7.  <u>Miscellaneous</u>.  This Agreement represents the entire understanding by the Parties, all Prior discussions, conversations and understandings being merged herein. Any amendments or modification of this Agreement shall be in a written instrument signed by the parties. This Agreement shall be governed and construed pursuant to the laws of the State of California as though it were to be performed in its entirety within the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this agreement this ____ day of February, 2004.

AGREED TO AND ACCEPTED

HARDSON                                  PARTNERS

By: _____            By: _____
    Trevant Hardson                          Romye Robinson

Exhibit 3
132