FREUND & BRACKEY LLP
Jonathan D. Freund (SBN 157357)
    *jfreund@freundandbrackey.com*
Craig A. Huber (SBN 159763)
    *cahuber@freundandbrackey.com*
Stephen P. Crump (SBN 251712)
    *scrump@freundandbrackey.com*
427 North Camden Drive
Beverly Hills, CA 90210
Tel: 310-247-2165
Fax: 310-247-2190

Attorneys for Defendants,
    DELICIOUS VINYL, INC., TREVANT HARDSON and DERRICK
    STEWART

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROMYE ROBINSON, an individual; and IMANI WILCOX, an individual, <br><br> Plaintiff, <br><br> v. <br><br> DELICIOUS VINYL RECORDS, LLC, a California limited liability company; TREVANT HARDSON, an individual; DERRICK STEWART, an individual; and DOES 1–50, <br><br> Defendants. | Case No.: 2:13-CV-04111-CAS-PLA <br><br> **DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION** <br><br> Date:        July 22, 2013 <br> Time:        10:00 a.m. <br> Location:    Courtroom 5 <br>              Hon. Christina A. <br>              Snyder |

Defendants DELICIOUS VINYL, INC., TREVANT HARDSON and

DERRICK STEWART, by and through their attorneys of record, hereby file the

following Opposition to the Court's OSC Re: Plaintiffs ROMYE ROBINSON and

IMANI WILCOX's Request for Preliminary Injunction:

///

///

///

///

# TABLE OF CONTENTS

Page

I.     INTRODUCTION.................................................................................2

II.    STATEMENT OF FACTS...............................................................3

III.   LEGAL ANALYSIS...........................................................................9

     A.    Burden on Preliminary Injunction...........................................9

     B.    Plaintiffs Are Not Likely To Succeed On The Merits of Their Claims.................................................................................10

          1.    As the Defendants Have a License to Use the Marks Under the Circumstances Alleged in the Complaint, Plaintiffs Cannot Prevail On Their Claims...........................................11

               a.    *Delicious Vinyl possesses a license to use "Pharcyde" in connection with its copyrighted work "Bizarre Ride II the Pharcyde*..............................................12

               b.    *Hardson and Stewart each possess licenses to use "Pharcyde" in connection with their live performances.*..............................................................12

               c.    *The Bizarre Ride Tour does not violate the terms of Plaintiffs' contractual licenses*.............................13

          2.    Plaintiffs Have Failed to Show A Substantial Likelihood That Defendants Should Be Held Secondarily Liable For the Acts of Third Party Concert Promoters...........................15

          3.    Plaintiffs' Trademark and Unfair Competition Claims are Barred By the Doctrine of Fair Use............................16

     C.    Plaintiffs Will Not Suffer Irreparable Harm As A Result Of Defendants' Conduct.............................................................18

     D.    The Balance Of Hardships Tilts In Defendants' Favor And An Injunction is Not in The Public Interest..................................19

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1

      **E.**    **If a Preliminary Injunction Issues Then Plaintiffs Must be**

2             **Required to Post a Bond.**……………………………….............21

3  **IV.**    **CONCLUSION**...........................................................................22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Freund & Brackey LLP*
*427 North Camden Drive*
*Beverly Hills, CA 90210*

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

**TABLE OF AUTHORITIES**                                                   Page

**CASES**

*A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)……………...11

*Bernhardt v. L.A. County*, 339 F.3d 920 (9th Cir. 2003).........................................21

*Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,* 363 U.S. 528 (1960)...........................................................................................................9

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002)………………………17

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267 (2nd Cir. 1995)…...17

*Caribbean Marine Service Co. v. Baldrige,* 844 F.2d 668 (9th Cir. 1988)……...10

*Continental Airlines v. Intra Brokers, Inc.,* 24 F.3d 1099 (9th Cir. 1994)…………19

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.)……11

*Goldie's Bookstore v. Sup. Ct.*, 739 F.2d 466, 471 (9th Cir. 1984)............................................................................................................19

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423 (1974) ……………………11

*H-D Michigan v. Bikers Dream,* 1998 U.S. Dist. LEXIS 17259 (C.D. Cal. July 28, 1998)...............................................................................................................15

*Hard Rock Café Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143 (7th Cir. 1992).........................................................................................................15

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298 (6th Cir. 2001)…..........................................................................................................17

*Hilton v. Hallmark Cards,* 599 F.3d 894 (9th Cir. 2010)…………………………..15

*Implant Direct Sybron Int'l v. Zest IP Holdings, LLC*, 2012 U.S. Dist. LEXIS 76485 (S.D. Cal. May 31, 2012)........................................................................................15

*Inwood Labs v. Ives Labs.,* 456 U.S. 844 (1982)………………………………...16

*Klein v. City of Laguna Beach*, 381 Fed. Appx. 723 (9th Cir. 2010)………………11

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980).......................................................................................................18, 19

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

*Martin v. International Olympic Committee,* 740 F.2d 670 (9th Cir. 1984)…….9–10

*Mattel, Inc. v. Walking Mountain Productions,* 353 F.3d 792 (9th Cir. 2003)…….17

*Mead Johnson & Co. v. Abbott Labratories*, 201 F.3d 883 (2000)……………...…22

*Miller v. California Pacific Medical Center,* 19 F.3d 449 (9th Cir. 1994)………..10

*New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992)..17

*Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037 (N.D. Cal. 2004)…19

*ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197 (D. Cal. 2009)……………11

*Sammartano v. First Judicial District Court,* 303 F.3d 959 (9th Cir. 2002)…...19–20

*Sampson v. Murray,* 415 U.S. 61 (1974)..................................................................9

*San Francisco Arts and Athletics, Inc. v. U.S. Olympic Comm*., 483 U.S. 522,(1987)......................................................................................................17

*Stanley v. Univ. of Southern California,* 13 F.3d 1313 (9th Cir. 1994)…………9, 10

*Victoria's Secret Stores v. Artco Equip. Co.,* 194 F. Supp. 2d 704 (S.D. Ohio 2002)………………………………………………………………………..17

*Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752 (N.D. Ill. 2008)…………..15

*Winter v. NRDC, Inc.,* 555 U.S. 7 (2008)..................................................................19

**STATUTES**

California Civil Code

       Section 3344..............................................................................................15

Federal Rules of Civil Procedure

       Rule 65(c)................................................................................................21

United States Code

       Title 15

            Section 1115(b)(4)…………………………………………………..17

**TREATISES**

11 A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2954 (2d ed. 1995)…………………………………………………………………22

iv

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case is a classic dispute among erstwhile band mates all claiming certain rights to the name of their former band and some of its works.  The band is the hip-hop act, Pharcyde, and it achieved significant commercial success in the early 90's, with the album *Bizarre Ride II the Pharcyde* reaching certified gold status in 1996. Since then the group has gone through a few iterations and a variety of agreements have been signed among the members regarding everyone's respective rights to the intellectual property in question.

In particular, the group entered a recording agreement with defendant Delicious Vinyl, which gave that entity broad rights to the Pharcyde name as well as the names and likenesses of the members.  And while certain agreements were executed among the members pertaining to certain elements of the property at issue, including allowing defendants to represent themselves as former members of Pharcyde, this dispute arose following Delicious Vinyl's decision to celebrate the 20th anniversary of the release of the *Bizarre Ride II the Pharcyde* album, which included a live tour in which two of the former members of Pharcyde performed. Boiled to its essence, Plaintiffs—the two remaining members of the group Pharcyde, claim Delicious Vinyl and two other original members of Pharcyde are infringing plaintiffs' rights to the group name (and other claimed property rights) during their present tour.

Plaintiffs now seek an injunction that enjoins defendants from using the rights to which there are contractually entitled in connection with their own tour.  The fact is, however, in addition to failing to produce evidence demonstrating they are likely to prevail on the merits of any of their claims, the plaintiffs have also failed to adduce evidence showing they will suffer irreparable harm if an injunction does not issue for the simple reason any harm they suffer can be adequately compensated through monetary damages.  And while they argue harm has been caused to their

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

1   reputations and goodwill, they have proffered no evidence whatsoever to support

2   this assertion.

3       Still further, the only conceivable wrongdoing even remotely relevant here

4   pertains to certain third party promoters who may have overstated the participation

5   of Pharcyde in certain performances but these defendants cannot control those third

6   parties' actions and to the extent they were made aware of any such activities,

7   Defendants have produced evidence showing these supposed transgressions were

8   remedied.

9       At the end of the day, this dispute is a simple matter of contract interpretation

10  that should find its way through the normal course of litigation and allow the parties

11  to build their cases and present evidence so that a jury may decide who owns what

12  and what, if any, damages were suffered.  There is simply no need for injunctive

13  relief at this point in the litigation and the Plaintiffs' meager evidence does not

14  change this conclusion.

15  **II.   STATEMENT OF FACTS**

16      Delicious Vinyl is an independent record label founded in 1987 and based in

17  Los Angeles.  (*See* Declaration of Michael Ross ("Ross Decl.") at ¶ 2).

18      In or around May 31 of 1992, Delicious Vinyl entered a Recording

19  Agreement with a hip-hop group known as The Pharcyde ("Pharcyde"), which then

20  consisted of members TREVANT HARDSON ("Hardson"), DERRICK STEWART

21  ("Stewart") and Plaintiffs ROMYE ROBINSON ("Robinson") and IMANI

22  WILCOX ("Wilcox").  This Agreement contemplated that Pharcyde would release

23  seven (7) work for hire LPs recorded and mastered by Delicious Vinyl unless the

24  Agreement was earlier terminated.  (*See id.* at ¶ 3).

25      Pursuant to this 1992 Agreement, Pharcyde (including Plaintiffs Robinson

26  and Wilcox) agreed that the copyrights in all albums produced under the agreement,

27  including the master recordings and associated artwork, would be the exclusive

28  property of Delicious Vinyl.  (*See id.* at ¶ 4).

1    Each member of Pharcyde also agreed that Delicious Vinyl and its designees

2  would "have the worldwide right in perpetuity to use and to permit others to use

3  [their] name (both legal and professional, and whether presently or hereafter used by

4  [them]), approved likeness, other identification, and approved biographical material

5  concerning [them] for purposes of advertising, promotion, or trade in connection

6  with such master recordings recorded hereunder, the phonograph records derived

7  therefrom, goodwill advertising related to [Delicious Vinyl's] record business."  The

8  Agreement further provided that "[t]he rights granted to [Delicious Vinyl] pursuant

9  to this paragraph with respect to [Pharcyde and each member's] name, likeness,

10  other identification and biographical material concerning [Pharcyde] shall be

11  exclusive during the term hereof and non-exclusive thereafter."  (*See id.* at ¶ 5).

12    By November of 1992, during the first year of the 1992 Recording

13  Agerement, Delicious Vinyl, with the contributions of producers J-Sw!ft and L.A.

14  Jay recorded, produced and released Pharcyde's debut album, entitled *Bizarre Ride*

15  *II the Pharcyde* (*"Bizarre Ride"*).  The album, along with 16 master recordings

16  featuring the vocal performances of Pharcyde over mixed musical beats, also

17  included artwork depicting cartoon-like caricatures of the members of Pharcyde,

18  fanciful psychedelic scenery and unique, distinctive fonts for the title of the work

19  designed by the artist professionally known as Fuct, along with additional

20  photography of the members of Pharcyde.  (*See id.* at ¶ 6, Ex. B).

21    Pursuant to the 1992 Recording Agreement, Delicious Vinyl obtained a

22  copyright registration in the sound recordings, artwork and photography of *Bizarre*

23  *Ride* on or around December of 1992.  (*See id.* at ¶ 7, Ex. C).

24    Over the years since its release, *Bizarre Ride*, which reached the RIAA's

25  certified gold status in 1996 (over 500,000 copies sold) has become one of the most

26  acclaimed and influential albums in hip-hop.  It is credited in establishing an

27  "alternative hip-hop" scene on the West Coast and is ranked highly among the top

28  albums of its generation by various notable music publications, including *The*

*Source* (featured on 100 Best Rap Albums list), *Allmusic* (perfect five star rating), *Rolling Stone* (four stars), *Q* (four stars), and *NME* (The Top 50 LPs of 1993).  (*See id.* at ¶ 8).

Though Pharcyde released one additional album with Delicious Vinyl in 1995 under the terms of the 1992 Recording Agreement, entitled *Labcabincalifornia*, the album did not garner nearly as much sales or notoriety as its predecessor *Bizarre Ride*, failing to reach the RIAA's certified gold status. (*See id.* at ¶ 9).

After terminating their relationship with Delicious Vinyl, and after the departure of Stewart and eventually Hardson from Pharcyde, Plaintiffs produced several albums as Pharcyde with various record labels, including *Plain Rap* and *Humboldt Beginnings*, which did not obtain the gold certification, chart positions and media notoriety of the successful debut album produced with the contributions of Delicious Vinyl and Defendants Hardson and Stewart.  (*See id.* at ¶ 10).

In 2004, Hardson signed a settlement agreement with Robinson and Wilcox (the remaining members of Pharcyde) which allowed him to make "public reference to himself as 'formerly of the Pharcyde'" without breaching the agreement.  (*See* Exhibit 1 to Robinson Declaration in support of App. for OSC Re: Preliminary Injunction ("Motion") at ¶ 4(b) ("Robinson Decl."))

In 2008, Hardson and Stewart reunited with the remaining two members of Pharcyde (Plaintiffs) to do a tour.  In the tour agreement, Hardson and Stewart reserved the right to "present themselves individually or collectively as 'formerly of the Pharcyde.'"  (*See* Robinson Decl. Ex. 4 at ¶ 4).

In or around early 2012, as part of the marketing, sales and promotion for the re-release of its seminal recording *Bizarre Ride* and in order to commemorate the album's twentieth anniversary, Delicious Vinyl organized a live performance of *Bizarre Ride* in its entirety at the Roxy Theater in Los Angeles, California by Defendants Hardson and Stewart, along with original producers J-Sw!ft and LA Jay

1  as a new hip-hop group called Bizarre Ride Live (the "Bizarre Ride Live Tour").

2  (*See* Ross Decl. at ¶ 11).

3       The advertising, design and media materials produced and provided for the

4  Bizarre Ride Live Tour evoked the fact that Delicious Vinyl was not reuniting

5  Pharcyde, but rather presenting a commemorative live performance of its

6  copyrighted work featuring two former members of the group, Hardson and Stewart

7  in a new collective.  (*See* Ross Decl. at ¶ 12).

8       On or around May 11, 2012, Defendants received communications from an

9  attorney for Plaintiffs by the name of Eric Griffin concerning Hardson and Stewart's

10 performances for the Bizarre Ride Live Tour.  In such communications, Plaintiffs

11 acknowledged that Delicious Vinyl possessed the right to market and promote its

12 own copyrighted material (*Bizarre Ride*) by former members of Pharcyde and

13 confirmed that Plaintiffs did "not dispute the right of The Roxy or Delicious Vinyl

14 to produce and promote such a show."  (*See* Ross Decl. at ¶ 12; Declaration of Kyle

15 Mortensen ("Mortensen Decl.") at ¶ 4, Ex. A).

16      Later in May of 2012, Hardson and Stewart performed as "Bizarre Ride Live"

17 at the Roxy Theater.  Rather than performing music as "Pharcyde," Hardson and

18 Stewart performed *Bizarre Ride* in its entirety as a commemoration to the twentieth

19 anniversary and re-release of the album by Delicious Vinyl.  The peripheral

20 elements of the show, such as the tour merchandise and the stage construction, made

21 it explicit to members of the live audience that Hardson and Stewart were not

22 representing themselves as The Pharcyde, but as former members of the Pharcyde

23 performing with two Delicious Vinyl producers as a new group "Bizarre Ride Live."

24 (*See* Ross Decl. at ¶ 14; Mortensen Decl. at ¶ 5).

25      After the May 2012 Roxy performance proved successful, Delicious Vinyl

26 expanded the 20th Anniversary Bizarre Ride Live Tour to other venues in the

27 United States and abroad.  In communications and negotiations with concert tour

28 promoters, Delicious Vinyl made it clear that the Bizarre Ride Live Tour was

1  intended to commemorate and generate interest in the album *Bizarre Ride* by two
2  former members of the group, rather than represent a reunion of "Pharcyde," and
3  that the performances were not to be billed as "Pharcyde" shows. (*See* Ross Decl. at
4  ¶ 15; Mortensen Decl. at ¶ 6).

5        Though promoters for the most part complied with Delicious Vinyl's explicit
6  directive, there were some occasions in which European third-party booking agents
7  and venues mistakenly billed the Bizarre Ride Live shows with references to
8  performances by "Pharcyde."  As Delicious Vinyl was cognizant of Hardson (and
9  Stewart's) obligations to specify that they were former (as opposed to current)
10 members of Pharcyde pursuant to their contracts with Plaintiffs, Defendants
11 immediately and promptly instructed these third parties to correct any
12 advertisements and promotional communications to reflect Delicious Vinyl's initial
13 instructions.  In each such circumstance, said third parties acted rapidly in
14 complying with Defendants' instructions and removed any indications that the
15 shows were connected with live performances by "Pharcyde" as opposed to "Bizarre
16 Ride Live." (*See* Ross Decl. at ¶ 16; Mortensen Decl. at ¶ 7, Ex. B).

17        Defendants did not deliberately book shows in the same locations in which
18 Plaintiffs had already booked live performances.  Defendants selected venues and
19 locations based on markets in the United States and Europe in which Delicious
20 Vinyl wanted to generate interest in *Bizarre Ride* and selected these venues
21 independently of any scheduled appearances by Plaintiffs. (*See* Ross Decl. at ¶ 17;
22 Mortensen Decl. at ¶ 8).

23        The tour poster for "The Bizarre Ride II the Pharcyde" bills the show as
24 "Delicious Vinyl Presents" "Celebrating the 20 Year Anniversary" of "Bizarre Ride
25 II The Pharcyde," "The Full Album From Start to Finish," "Featuring Fatlip
26 [STEWART], Slim Kid Tre [HARDSON], J. Sw!ft and LA Jay" and advertises the
27 re-released singles collection from the album. (*See* Ross Decl. at ¶ 18, Ex. D).

28

The home page for "The Bizarre Ride II the Pharcyde," features information regarding the Bizarre Ride Live Tour, including pictures, blogs, press kits, tour dates and merchandise.  Along with offering tickets to the Live Tour, the website prominently offers copies of its original album *Bizarre Ride* and the remastered twentieth anniversary boxed set.  (*See id.* at ¶ 19, Ex. E).

In the official press release for the initial performance of the Bizarre Ride II Tour provided to reporters and other media outlets, Delicious Vinyl explains Hardson and Stewart's roles as former members of Pharcyde and clarifies that the tour is a commemoration of the twentieth anniversary of *Bizarre Ride*.  (*See id.* at ¶ 20, Ex. F).

In the official promotional magazine for the Bizarre Ride II Tour provided to booking agents, tour promoters, and fans, Delicious Vinyl explains the history of *Bizarre Ride*, explains that Hardson and Stewart are former members of Pharcyde and states that the tour features a new hip hop group called "Bizarre Ride" performing an anniversary commemoration of *Bizarre Ride* the album.  (*See id.* at ¶ 21, Ex. G).

Since 2012, Defendants Hardson and Stewart have made numerous appearances in the United States and Europe for the Bizarre Ride Live Tour.  These performances continue to be advertised, marketed and promoted as "Bizarre Ride Live" shows rather than "Pharcyde" shows with Hardson and Stewart referring to themselves as formerly of the Pharcyde in compliance with their contractual obligations.  (*See id.* at ¶ 22).

Notably, Plaintiffs have engaged in the very same conduct of which they allege in their Complaint, that is deliberately misleading consumers with respect to their connection with Defendants.  Specifically, up until as recently as several weeks ago, Plaintiffs have utilized photographs and/or likenesses of Defendant Hardson without his consent as late as in connection with their website and tour posters.  (*See* Mortensen Decl. at ¶ 10, Ex. C).  In another example, Plaintiffs doctored a

promotional Twitter message about a Pharcyde appearance in December of 2012 to make it appear that the message was sponsored and approved by Defendant Hardson.  (*See id.* Ex. D).

The Bizarre Ride Live Tour has generated significant income for Delicious Vinyl and Defendants Hardson and Stewart from ticket sales, album sales and merchandising revenue.  Defendants Delicious Vinyl, Hardson and Stewart receive an average of $5,000-10,000 in profits for each performance, which have spanned over two continents and almost thirty cities in 2013.   Based on the success of the American tour and the European tour, Defendant Delicious Vinyl may return to present Bizarre Ride Live Tour performances in North America later in 2013, as well as Asia and South America depending on the continued popularity and reception of the tour.  If Plaintiffs are awarded an injunction and can prevent Delicious Vinyl from marketing its own copyrighted products with the performances of Hardson and Stewart, Defendants will stand to lose as much as $500,000 in additional net revenues, including additional anticipated album and merchandise sales.  (*See* Ross Decl. at ¶ 23).

## III.   LEGAL ANALYSIS

### A.   Burden on Preliminary Injunction.

While courts are given considerable discretion in deciding whether a preliminary injunction should enter, and injunctive relief is not obtained as a matter of right, it is also considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Sampson v. Murray,* 415 U.S. 61 (1974); *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,* 363 U.S. 528 (1960); and *Stanley v. Univ. of Southern California,* 13 F.3d 1313 (9th Cir. 1994).

In the case of *Martin v. International Olympic Committee,* 740 F.2d 670, 674–675 (9th Cir. 1984), the Ninth Circuit stated that a party seeking preliminary injunctive relief must meet one of two tests. Under the first,

1
2
3
4
5

> [A] court may issue a preliminary injunction if it finds that: (1) the [moving party] will suffer irreparable harm if injunctive relief is not granted, (2) the [moving party] will probably prevail on the merits, (3) in balancing the equities, the [non-moving] party will not be harmed more than [the moving party] is helped by the injunction, and (4) granting the injunction is in the public interest.

6   *Id.* (internal quotations and citations omitted); and *Stanley v. Univ. of Southern*

7   *California,* 13 F.3d 1313, 1319 (9th Cir. 1994).

8       Under the second, the movant must show "either (1) a combination of

9   probable success on the merits and the possibility of irreparable harm, or (2) the

10  existence of serious questions going to the merits, the balance of hardships tipping

11  sharply in its favor, and at least a fair chance of success on the merits." *Miller v.*

12  *California Pacific Medical Center,* 19 F.3d 449, 456 (9th Cir. 1994) (en banc). This

13  alternative test is on a sliding scale: the greater the likelihood of success, the less

14  risk of harm must be shown, and vice versa. *Id.*

15      Speculative injury is insufficient to support a finding of irreparable harm.  As

16  the Ninth Circuit has stated,

17
18
19
20

> Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction … a plaintiff must do more than merely allege imminent harm to establish standing, a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.

21  *Caribbean Marine Service Co. v. Baldridge,* 844 F.2d 668, 674 (9th Cir. 1988).  As

22  demonstrated below, plaintiffs have not made a clear showing on their burden of

23  persuasion under either test and thus their request for a preliminary injunction must

24  be denied.

25      **B.      Plaintiffs Are Not Likely To Succeed On The Merits of Their**

26      **Claims.**

27      Each test for a preliminary injunction requires an analysis of whether

28  plaintiffs can make a clear showing they are likely to prevail on the merits.  Here,

1  they can make no such showing.

2      "[T]he likelihood of success on the merits and the balance of hardships are the

3  critical considerations in determining whether a preliminary injunction should issue

4  in a trademark infringement action." *See, e.g., Dr. Seuss Enters., L.P. v. Penguin*

5  *Books USA, Inc.*, 109 F.3d 1394, 1406 (9th Cir.).  Plaintiff's burden to prove likely

6  success on the merits includes a showing that it would likely prevail against any

7  affirmative defenses raised by Defendant. *See A&M Records v. Napster, Inc.*, 239

8  F.3d 1004, 1015 n.3 (9th Cir. 2001); *see also Dr. Seuss Enterprises v. Penguin Book*

9  *USA*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996).

10      Likelihood of success on the merits must be based on admissible evidence in

11  the record, rather than surmise or speculation concerning what evidence could be

12  produced at trial. The evidence before the district court did not support the court's

13  findings, and the district court's characterization of the City's briefs as "uncontested

14  evidence" was erroneous. Arguments are not evidence.  *Klein v. City of Laguna*

15  *Beach*, 381 Fed. Appx. 723, 726 (9th Cir. 2010).  A preliminary injunction is an

16  extraordinary remedy, and Plaintiffs have the burden of proving the propriety of

17  such a remedy by clear and convincing evidence. *See Granny Goose Foods, Inc. v.*

18  *Teamsters*, 415 U.S. 423, 442, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974);

19  *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197, 1204 (D. Cal. 2009).

20      **1.   As the Defendants Have a License to Use the Marks Under**

21         **the Circumstances Alleged in the Complaint, Plaintiffs**

22         **Cannot Prevail On Their Claims.**

23      As Delicious Vinyl, Hardson, and Stewart each obtained an express license

24  from Plaintiffs to use "THE PHARCYDE" and/or "BIZARRE RIDE II: THE

25  PHARCYDE" in connection with the marketing, promotion and advertising of their

26  copyrighted works and musical performances, Plaintiffs cannot state claims for

27  breach of contract, trademark infringement, unfair competition, or right of publicity

28  against these Defendants.

1
2
3

           *a.     Delicious Vinyl possesses a license to use "Pharcyde" in connection with its copyrighted work "Bizarre Ride II the Pharcyde."*

4       Through its recording agreement with Plaintiffs, Delicious Vinyl possesses a

5 license to use the marks alleged in the Complaint.  In its initial May 31, 1992

6 Recording Agreement with Plaintiffs, Hardson and Stewart (constituting the original

7 members of The Pharcyde), Delicious Vinyl and its designees obtained the

8 perpetual, worldwide right to use and to permit others to use the name "Pharcyde"

9 and each individual group members' (including Plaintiffs) respective names and

10 likenesses "for purposes of advertising, promotion, or trade" in connection with any

11 master recordings produced under that Agreement.  (*See* Ross Decl. at ¶ 5).

12 Pursuant to the work for hire provision of the 1992 Agreement, Delicious Vinyl also

13 possessed full right, title and interest in the copyrights in those master recordings.

14 (*See id.* at ¶ 4).  *Bizarre Ride II the Pharcyde* was the initial album released under

15 this Agreement on November 24, 1992 and Delicious Vinyl registered a copyright in

16 the sound recordings, artwork and photography of *Bizarre Ride II the Pharcyde* that

17 same year.  (*See id.* at ¶ 6).

18
19

           *b.     Hardson and Stewart each possess licenses to use "Pharcyde" in connection with their live performances.*

20       By virtue of two agreements signed with the remaining members of Pharcyde

21 (Plaintiffs), both Hardson and Stewart obtained the license to use "Pharcyde" in

22 connection with their live performances.

23       In 2004, Plaintiffs agreed to settle certain claims with Hardson in exchange

24 for his "disassociation" from The Pharcyde.  While the 2004 Agreement prevents

25 Hardson from "avail[ing] himself of or us[ing] the name, trademark and/or

26 designation 'The Pharcyde,' 'Pharcyde,' . . . or any derivative or substantially

27 similar designation," Hardson explicitly reserved the right to make public reference

28 to himself as formerly of the Pharcyde to reflect his previous involvement in the

1   group.  (*See* Robinson Decl. Ex. 1).

2        Similarly, in 2008, Plaintiffs entered a Tour Agreement with Hardson and

3   Stewart in which they gave both individual Defendants the license to present

4   themselves individually or collectively as formerly of the Pharcyde into perpetuity.

5   (*See id.* Ex. 4).

6                    **c.       The Bizarre Ride Tour does not violate the terms of**

7                              **Plaintiffs' contractual licenses.**

8        The Bizarre Ride Live Tour, in which Delicious Vinyl has organized a series

9   of promotional live performances in which Hardson and Stewart perform its

10  copyrighted album *Bizarre Ride II the Pharcyde* at public venues to celebrate the

11  20th Anniversary of the master recording, does not violate the terms of either of

12  Plaintiffs' contractual licenses.

13       In 2012, in order to commemorate the twentieth anniversary and re-release of

14  an expanded edition of the *Bizarre Ride II the Pharcyde*, Delicious Vinyl began

15  organizing live performances by Hardson and Stewart (advertised as former

16  members of Pharcyde) in various venues around the nation and abroad in which they

17  performed the album in its entirety along with J-Sw!ft and LA Jay (producers

18  associated with *Bizarre Ride* and Delicious Vinyl).  The group refers to themselves

19  as "Bizarre Ride Live."  As the live performances were calculated to generate

20  renewed interest and sales for *Bizarre Ride II the Pharcyde* and the re-released

21  boxed set, Delicious Vinyl marketed the live performances along with copies of the

22  master recordings which it offers for sale on the promotional website

23  <www.bizarreridelive.com>.  (*See* Ross Decl. at ¶¶ 11–12, Exs. D–G).

24       On the *Bizarre Ride* website, promotional flyers, press releases and interviews

25  for the Bizarre Ride Live Tour, Defendants have complied with the terms of their

26  respective licenses, taking great care to differentiate themselves from The Pharcyde

27  to avoid consumer confusion.  All official advertisements for the Bizarre Ride Live

28  Tour specify that Fatlip and SlimKid3 are "formerly of the Pharcyde" in compliance

with the terms of the 2004 Settlement and Disassociation Agreement and the 2008 Tour Agreement.  (*See, e.g., id.* at Ex. D)  Merchandise sold in connection with the 2013 world tour references "Bizarre Ride Live World Tour" and does not reference "Pharcyde."  In the promotional magazine for the tour distributed to the various venues which host Hardson and Stewart, Delicious explains that Fatlip (Stewart) and SlimKid3 (Hardson) are formerly of the Pharcyde and have created a "new hip hop group" with producers J-Sw!ft and LA Jay.  (*See id.* at Ex. G)  The materials further contrasts Plaintiffs and clarifies that "Bootie Brown [Robinson] and Imani [Wilcox] continue to tour as 'The Pharcyde.'"  (*Id.*)  Similarly, in the Press Sheet distributed by Delicious to European promoters and reporters, Defendants specify that the group formed to perform *Bizarre Ride* in its entirety was a new group called "**Bizarre Ride Live**" (emphasis in original) as opposed to the "original Pharcyde." (*See id.* at Ex. F)  The stage decoration for the live shows features album artwork from the *Bizarre Ride*, all copyrighted material owned by Delicious Vinyl under the scope of the 1992 Recording Agreement.  (*Id.*)  During live performances, Hardson and Stewart refer to themselves as "Bizarre Ride Live," differentiating themselves from Plaintiffs, the remaining members of Pharcyde.  (*See id.* at ¶ 14; Mortensen Decl. at ¶ 5).

As Defendant Delicious Vinyl has not utilized The Pharcyde mark outside the parameters of its limited license to use it in connection with the promotion of copyrighted material produced pursuant to the 1992 Recording Agreement and the individual Defendants Hardson and Stewart use The Pharcyde only to legitimately reference their former history with the group, there is no breach of contract and Plaintiffs' first through third causes of action must fail.  *Indeed, Plaintiffs themselves acknowledge that Delicious Vinyl has the "right . . . to produce and promote such a show."*  (*See* Mortensen Decl. at ¶ 4, Ex. A).

Moreover, as Plaintiffs gave an express license to Defendants Hardson and Stewart to perform as former members of Pharcyde and expressly permitted

1    Defendant Delicious Vinyl to use "Pharcyde" and their names and likenesses in
2    connection with the promotion of its copyrighted materials—their claims for
3    trademark infringement, publicity, unfair competition and false advertising—which
4    are all necessarily predicated on a lack of authorization, must also fail.  *See, e.g., H-*
5    *D Michigan v. Bikers Dream,* 1998 U.S. Dist. LEXIS 17259 (C.D. Cal. July 28,
6    1998); *Implant Direct Sybron Int'l v. Zest IP Holdings, LLC*, 2012 U.S. Dist. LEXIS
7    76485 (S.D. Cal. May 31, 2012) (claims for trademark infringement and unfair
8    competition based on lack of authorization or license from trademark owner); *Hilton*
9    *v. Hallmark Cards,* 599 F.3d 894, 909 (9th Cir. 2010) (the elements of a common
10   law claim for misappropriation require a lack of consent); Cal. Civ. Code § 3344(a)
11   (requires lack of "prior consent" for statutory claim for misappropriation of name
12   and likeness).

13   **2.      Plaintiffs Have Failed to Show A Substantial Likelihood That**
14   **Defendants Should Be Held Secondarily Liable For the Acts**
15   **of Third Party Concert Promoters.**

16       Though Plaintiffs point to various promotional advertisements as evidence
17   that Defendants have been engaging in unauthorized uses of PHARCYDE and
18   BIZARRE RIDE II THE PHARCYDE, *the vast majority of these alleged uses are*
19   *by third-party concert promoters the acts of whom Defendants had no prior*
20   *knowledge, direction or control.*

21       It is well-established that in order to establish the secondary liability of a
22   defendant for the infringing acts of a third party, a party must either show: (1) that
23   there is a principal/agency relationship or sufficient apparent authority that the
24   "defendant and the infringer have an apparent or actual partnership, [and] have
25   authority to bind one another in transactions with third parties or exercise joint
26   ownership or control over the infringing product"  (vicarious liability); *See Hard*
27   *Rock Café Licensing Corp. v. Concession Serv., Inc.*, 955 F.2d 1143 (7th Cir. 1992);
28   *Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752 (N.D. Ill. 2008); or (2) that

the defendant intentionally induced the third party to engage in infringing conduct and continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement (contributory infringement); *Inwood Labs v. Ives Labs.,* 456 U.S. 844, 854, (1982).

Here Plaintiffs have provided no evidence that Defendants Delicious Vinyl or individuals Stewart and Hardson have the ability to directly control or supervise the European concert promoters which allegedly mistakenly referenced appearances by the "Pharcyde" in various European venues and/or induced these mistakes in any way. On the contrary, Defendants have introduced ample evidence that they instructed promoters in detail about the relationship between the Pharcyde and Bizarre Ride Live, that Defendants Stewart and Hardson were former members of Pharcyde, and that the show was a commemoration of *Bizarre Ride II the Pharcyde*, rather than an appearance by Pharcyde. (*See* Ross Decl. at ¶ 15, Exs. D–G; Mortensen Decl. at ¶ 6). Moreover, Defendants have testified and shown evidence that they have rapidly addressed these isolated incidents in Europe and Canada when they occurred. (*See* Ross Decl. at ¶ 16; Mortensen Decl. at ¶ 7, Ex. B). As there are no facts which demonstrate a substantial likelihood of secondary liability for what are clearly the acts of third-party promoters, liability for trademark infringement, right of publicity and/or unfair competition cannot attach to Defendants from the evidence presented by Plaintiffs.

### 3.    Plaintiffs' Trademark and Unfair Competition Claims are Barred By the Doctrine of Fair Use.

Even if Plaintiffs had not given Defendants a license to use the Pharcyde mark in connection with their live performances (they clearly did), the doctrine of fair use dictates that Plaintiffs should not have the right to prevent Defendants from using "the Pharcyde" to accurately describe copyrighted works owned by Defendants and live performances by former members of Pharcyde.

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

The Lanham Act provides a defense to an infringement claim where the use of the mark "is a use, otherwise than as a mark, ... which is descriptive of and used fairly and in good faith only to describe the goods ... of such party [.]"  15 U.S.C. § 1115(b)(4); *see San Francisco Arts and Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 565, (1987); *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298, 319 (6th Cir. 2001) ("Under the doctrine of 'fair use,' the holder of a trademark cannot prevent others from using the word that forms the trademark in its primary or descriptive sense.") (emphasis in the original); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2nd Cir. 1995) ("[F]air use permits others to use a protected mark to describe aspects of their own goods [.]").  In evaluating a defendant's fair use defense, a court must consider whether defendant has used the mark: (1) in its descriptive sense; and (2) in good faith.  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002); *Victoria's Secret Stores v. Artco Equip. Co.,* 194 F. Supp. 2d 704, 724 (S.D. Ohio 2002).

Classic fair use occurs where the defendant uses the plaintiff's mark to describe the defendant's own product.  *Mattel, Inc. v. Walking Mountain Productions,* 353 F.3d 792, 809 (9th Cir. 2003); *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Here, the name "Pharcyde" is not only included in the title of Delicious Vinyl's copyrighted work *Bizarre Ride II the Pharcyde*, it is also a legitimate and accurate description of two of the former individual members of that group.  Rather than exploiting the term Pharcyde and the likenesses of its members in order to confuse consumers with respect to the origin of their live performances, Delicious Vinyl, Hardson and Stewart have taken great care to use "Pharcyde" only in its descriptive sense and as part of the title of the copyrighted album *Bizarre Ride*.  (*See* Ross Decl. at ¶¶ 11–12, 15, Exs. D–G; Mortensen Decl. ¶¶ 5–6).  It follows pursuant to the doctrine of fair use that Delicious Vinyl, Hardson and Stewart should not be restrained from using the marks in this way and as a result, Plaintiffs' trademark and

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

1   unfair competition claims should be barred by the doctrine of fair use.

2   **C.    Plaintiffs Will Not Suffer Irreparable Harm As A Result Of**

3         **Defendants' Conduct.**

4        Plaintiffs have failed to clearly demonstrate they will suffer irreparable harm

5   in the absence of injunctive relief.   "Mere injuries, however substantial, in terms of

6   money, time and energy necessarily expended . . . are not enough.  The possibility

7   that adequate compensatory or other corrective relief will be available at a later date,

8   in the ordinary course of litigation, weighs heavily against a claim of irreparable

9   harm."  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,

10  1202 (9th Cir. 1980) (internal quotation marks omitted).

11       Here, while plaintiffs appear to argue they have, or will suffer damages to

12  their "prospective" and "existing goodwill" and to their "professional reputation,"

13  (Mt. at pg. 8), they have failed to offer any evidence suggesting they have suffered

14  such injury.  In fact, all they offer is the conclusory assertions of Mr. Robinson and

15  Mr. Wilcox who declare "[d]efendants' conduct has already cause irreparable harm

16  to us" including to their "reputations, individually, as a group, and harmed the

17  goodwill of Pharcyde…."  (Robinson Decl. at ¶¶ 22-23; Declaration of Imani

18  Wilcox in Support of Mt. ("Wilcox Decl.") at ¶¶ 22-23).[1]  What is lacking is any

19  real evidence of how or why this is the case.  There is no direct evidence of

20  consumer confusion or of a tangible diminishment is Pharcyde's reputation or

21  goodwill, which of course begs the question:  how exactly have these gentlemen's

22  reputations been damaged and how has Pharcyde's goodwill been harmed?  The fact

23  is these declarations offer only surmise and unfounded conclusions that certainly do

24  not rise to the level of admissible evidence.[2]

25       To be sure, these declarations support at most a possible claim that defendants

26

27  _____

[1] The declarations are identical on these points.
[2] While plaintiffs argue in their moving papers that they "received numerous inquiries from fans
28  actually confused by Defendants' misleading advertisements and promotional materials" (Mt. at
pg. 9) *there is not one shred of evidence before this Court to support this assertion*.

Freund & Brackey LLP
427 North Camden Drive
Beverly Hills, CA 90210

DEFENDANTS' OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

were "harmed . . . economically" (Id.) and under existing law, injuries of this sort simply do not support injunctive relief.  *Nat'l Football League, supra*, 634 F.2d at 1202.  *See also Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) ("An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial."); *Goldie's Bookstore v. Sup. Ct.*, 739 F.2d 466, 471 (9th Cir. 1984) (Mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation).

For these reasons plaintiffs have not (and cannot) demonstrate they will suffer irreparable harm if injunctive relief is denied.

## D.   The Balance Of Hardships Tilts In Defendants' Favor And An Injunction is Not in The Public Interest.

Finally, plaintiffs request for a preliminary injunction should be denied because the hardships imposed by such an order on defendants is greater than any speculative damage the plaintiffs claim they will suffer in the absence of an injunction.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.,* 555 U.S. 7, 19 (2008) (citations omitted); *see also Continental Airlines v. Intra Brokers, Inc.,* 24 F.3d 1099, 1104 (9th Cir. 1994) (stating that courts should balance hardships between plaintiffs and defendants in considering injunctions). "The factors examined above-the balance of equities and consideration of the public interest-are pertinent in assessing the propriety of any injunctive relief." *Id.* at 381. "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Judicial District Court,* 303 F.3d 959, 974 (9th Cir. 2002).

Here again the plaintiffs have failed to offer any meaningful evidence they have suffered hardship owing to anything done by these defendants.  There is simply no evidence of any cancelled shows, consumer confusion or other detriment that is attributable to the actions of these defendants.  At most there is some evidence that certain third-party promoters may have mistakenly billed defendants' performances as "The Pharcyde" these defendants had nothing to do with the particular promotions.  (*See* Ross Decl. at ¶ 16; Mortensen Decl. ¶ 7, Ex. B)  And once defendants learning of any such mistakes, defendants' representatives "immediately and promptly instructed these third parties to correct" such mistakes in the billing or advertising.  (*Id.*).  Plaintiffs have offered no evidence that any of the things about which they complain on this score are attributable to these defendants nor that any of the supposed actions persisted beyond these third parties being directed to remedy the situation.

The same is true of plaintiffs claim that "Defendants booked shows in the very same cities that Plaintiffs were to play" on "dates that were days or weeks ahead of Plaintiffs' scheduled performances in each city." (Mt. at pg. 9)  *There is no evidence whatsoever of this supposed state of affairs* apart from argument and unfounded assertions in the Robinson and Wilcox declarations.  To be sure, neither of these gentlemen has cited to one specific city or one particular show date where defendants beat them to the proverbial punch.  And, according to Mr. Ross and Mr. Mortensen, these assertions are just not true.  (Ross Decl. at ¶ 17; Mortensen Decl. at ¶ 8)

There is, however, direct evidence of plaintiffs doing the very thing they accuse defendants of doing—namely using Defendant Hardson's name and likeness to promote plaintiffs' shows without their consent.  (*See* Mortensen Decl. at ¶ 10, Exs. C and D).

Finally, this is a private dispute that really does not implicate the public interest save and except for the fact issuing an injunction will deprive fans of

defendants from being able to see them perform when there really is not need for such a Draconian measure at this point in time. *See Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003) (When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be "at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.").

For all of these reasons, the plaintiffs have not met their burden of clearly demonstrating their right to a preliminary injunction and their request must therefore be denied.

**E.      If a Preliminary Injunction Issues Then Plaintiffs Must be Required to Post a Bond.**

In the event this Court determines injunctive relief is warranted then plaintiffs should be required to post an injunction bond in an amount that will cover the losses and damages suffered by Defendants in the event it turns out the injunction should not have been granted.

A district court must fix a bond whenever it grants a preliminary injunction or restraining order:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

> Fed. R. Civ. P. 65(c).

In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.  The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party:

The judge usually will fix security in an amount that covers the

1  potential incidental and consequential costs as well as either the
2  losses the unjustly enjoined or restrained party will suffer
   during the period he is prohibited from engaging in certain
3  activities or the complainant's unjust enrichment caused by his
   adversary being improperly enjoined or restrained.

4  11 A Charles Alan Wright et al., Federal Practice & Procedure § 2954, at

5  292 (2d ed. 1995). When setting the amount of security, "*district courts should err*

6  *on the high side*... [A]n error in the other direction produces irreparable injury,

7  because the damages for an erroneous preliminary injunction cannot exceed the

8  amount of the bond." *Mead Johnson & Co. v. Abbott Labratories*, 201 F.3d 883,

9  888 (2000)(emphasis added).

10  **IV.   CONCLUSION**

11       For all the foregoing reasons, this Court should deny Plaintiffs' request for a

12  preliminary injunction and allow this dispute to be litigated on its merits after the

13  parties have completed their discovery.  In the alternative, if this Court is inclined to

14  issue an injunction then Plaintiffs should be ordered to post a bond of no less than

15  $500,000.00 to ensure they are compensated for any harm suffered in the event the

16  injunction is found to have been improper.

17

18  DATED: July 1, 2013                    FREUND & BRACKEY LLP

19

20                                    By:   /Stephen P. Crump/

21                                          Jonathan D. Freund
                                            Craig A. Huber,
22                                          Stephen P. Crump,
                                            Attorneys for Defendants
23                                          DELICIOUS VINYL, INC.,
                                            TREVANT HARDSON and
24                                          DERRICK STEWART

25

26

27

28